MILKOVICH $v.$ LORAIN JOURNAL CO. ET AL.

No. 89–645.   Argued April 24, 1990—Decided June 21, 1990

2

Rehnquist, C. J., delivered the opinion of the Court, in which White, Blackmun, Stevens, O'Connor, Scalia, and Kennedy, JJ., joined. Brennan, J., filed a dissenting opinion, in which Marshall, J., joined, *post*, p. 23.

*Brent L. English* argued the cause for petitioner.  With him on the brief was *John D. Brown.*

*Richard D. Panza* argued the cause for respondents. With him on the brief were *William G. Wickens, David L. Herzer, Richard A. Naegele, P. Cameron DeVore,* and *Marshall J. Nelson.*\*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent J. Theodore Diadiun authored an article in an Ohio newspaper implying that petitioner Michael Milkovich, a local high school wrestling coach, lied under oath in a judicial proceeding about an incident involving petitioner and his team which occurred at a wrestling match. Petitioner sued Diadiun and the newspaper for libel, and the Ohio Court of Appeals affirmed a lower court entry of summary judgment against petitioner. This judgment was based in part on the grounds that the article constituted an "opinion" protected from the reach of state defamation law by the First Amendment to the United States Constitution. We hold that the First Amendment does not prohibit the application of Ohio's libel laws to the alleged defamations contained in the article.

This lawsuit is before us for the third time in an odyssey of litigation spanning nearly 15 years.[1] Petitioner Milkovich, now retired, was the wrestling coach at Maple Heights High

---

*Briefs of *amici curiae* urging affirmance were filed for Dow Jones & Co. et al. by *Robert D. Sack, Richard J. Tofel, Richard M. Schmidt, Jr., Devereux Chatillon, Douglas P. Jacobs, Barbara L. Wartelle, Harvey L. Lipton, Laura R. Handman, Slade R. Metcalf, Richard J. Ovelmen, Deborah R. Linfield, Jane E. Kirtley,* and *Bruce W. Sanford;* and for the American Civil Liberties Union et al. by *Henry R. Kaufman.*

*Louis A. Colombo* and *David L. Marburger* filed a brief for the Ohio Newspaper Association et al. as *amici curiae.*

[1] The Court has previously denied certiorari twice in this litigation on various judgments rendered by the Ohio courts. See *Lorain Journal Co.* v. *Milkovich,* 474 U. S. 953 (1985); *Lorain Journal Co.* v. *Milkovich,* 449 U. S. 966 (1980).

School in Maple Heights, Ohio. In 1974, his team was involved in an altercation at a home wrestling match with a team from Mentor High School. Several people were injured. In response to the incident, the Ohio High School Athletic Association (OHSAA) held a hearing at which Milkovich and H. Don Scott, the Superintendent of Maple Heights Public Schools, testified. Following the hearing, OHSAA placed the Maple Heights team on probation for a year and declared the team ineligible for the 1975 state tournament. OHSAA also censured Milkovich for his actions during the altercation. Thereafter, several parents and wrestlers sued OHSAA in the Court of Common Pleas of Franklin County, Ohio, seeking a restraining order against OHSAA's ruling on the grounds that they had been denied due process in the OHSAA proceeding. Both Milkovich and Scott testified in that proceeding. The court overturned OHSAA's probation and ineligibility orders on due process grounds.

The day after the court rendered its decision, respondent Diadiun's column appeared in the News-Herald, a newspaper which circulates in Lake County, Ohio, and is owned by respondent Lorain Journal Co. The column bore the heading "Maple beat the law with the 'big lie,'" beneath which appeared Diadiun's photograph and the words "TD Says." The carryover page headline announced " . . . Diadiun says Maple told a lie." The column contained the following passages:

"'. . . [A] lesson was learned (or relearned) yesterday by the student body of Maple Heights High School, and by anyone who attended the Maple-Mentor wrestling meet of last Feb. 8.

"'A lesson which, sadly, in view of the events of the past year, is well they learned early.

"'It is simply this: If you get in a jam, lie your way out.

"'If you're successful enough, and powerful enough, and can sound sincere enough, you stand an excellent chance of making the lie stand up, regardless of what really happened.

"'The teachers responsible were mainly head Maple wrestling coach, Mike Milkovich, and former superintendent of schools H. Donald Scott.

.        .        .        .        .

"'Anyone who attended the meet, whether he be from Maple Heights, Mentor, or impartial observer, knows in his heart that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth.

"'But they got away with it.

"'Is that the kind of lesson we want our young people learning from their high school administrators and coaches?

"'I think not.'" *Milkovich* v. *News-Herald*, 46 Ohio App. 3d 20, 21, 545 N. E. 2d 1320, 1321–1322 (1989).[2]

---

[2] In its entirety, the article reads as follows:

"Yesterday in the Franklin County Common Pleas Court, judge Paul Martin overturned an Ohio High School Athletic Assn. decision to suspend the Maple Heights wrestling team from this year's state tournament.

"It's not final yet—the judge granted Maple only a temporary injunction against the ruling—but unless the judge acts much more quickly than he did in this decision (he has been deliberating since a Nov. 8 hearing) the temporary injunction will allow Maple to compete in the tournament and make any further discussion meaningless.

"But there is something much more important involved here than whether Maple was denied due process by the OHSAA, the basis of the temporary injunction.

"When a person takes on a job in a school, whether it be as a teacher, coach, administrator or even maintenance worker, it is well to remember that his primary job is that of educator.

"There is scarcely a person concerned with school who doesn't leave his mark in some way on the young people who pass his way—many are the lessons taken away from school by students which weren't learned from a lesson plan or out of a book. They come from personal experiences with

6

Petitioner commenced a defamation action against respondents in the Court of Common Pleas of Lake County, Ohio, alleging that the headline of Diadiun's article and the

and observations of their superiors and peers, from watching actions and reactions.

"Such a lesson was learned (or relearned) yesterday by the student body of Maple Heights High School, and by anyone who attended the Maple-Mentor wrestling meet of last Feb. 8.

"A lesson which, sadly, in view of the events of the past year, is well they learned early.

"It is simply this: If you get in a jam, lie your way out.

"If you're successful enough, and powerful enough, and can sound sincere enough, you stand an excellent chance of making the lie stand up, regardless of what really happened.

"The teachers responsible were mainly head Maple wrestling coach, Mike Milkovich, and former superintendent of schools H. Donald Scott.

"Last winter they were faced with a difficult situation. Milkovich's ranting from the side of the mat and egging the crowd on against the meet official and the opposing team backfired during a meet with Greater Cleveland Conference rival Metor [sic], and resulted in first the Maple Heights team, then many of the partisan crowd attacking the Mentor squad in a brawl which sent four Mentor wrestlers to the hospital.

"Naturally, when Mentor protested to the governing body of high school sports, the OHSAA, the two men were called on the carpet to account for the incident.

"But they declined to walk into the hearing and face up to their responsibilities, as one would hope a coach of Milkovich's accomplishments and reputation would do, and one would certainly expect from a man with the responsible poisition [sic] of superintendent of schools.

"Instead they chose to come to the hearing and misrepresent the things that happened to the OHSAA Board of Control, attempting not only to convince the board of their own innocence, but, incredibly, shift the blame of the affair to Mentor.

"I was among the 2,000-plus witnesses of the meet at which the trouble broke out, and I also attended the hearing before the OHSAA, so I was in a unique position of being the only non-involved party to observe both the meet itself and the Milkovich-Scott version presented to the board.

"Any resemblance between the two occurrances [sic] is purely coincidental.

"To anyone who was at the meet, it need only be said that the Maple coach's wild gestures during the events leading up to the brawl were

nine passages quoted above "accused plaintiff of committing the crime of perjury, an indictable offense in the State of Ohio, and damaged plaintiff directly in his life-time occupation of coach and teacher, and constituted libel per se." App. 12. The action proceeded to trial, and the court granted a directed verdict to respondents on the ground that the evidence failed to establish the article was published with "actual malice" as required by *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964). See App. 21–22. The Ohio Court of Appeals for the Eleventh Appellate District reversed and remanded, holding that there was sufficient evidence of actual malice to go to the jury. See *Milkovich* v. *Lorain Journal*, 65 Ohio App. 2d 143, 416 N. E. 2d 662 (1979). The Ohio

---

passed off by the two as 'shrugs,' and that Milkovich claimed he was 'Powerless to control the crowd' before the melee.

"Fortunately, it seemed at the time, the Milkovich-Scott version of the incident presented to the board of control had enough contradictions and obvious untruths so that the six board members were able to see through it.

"Probably as much in distasteful reaction to the chicanery of the two officials as in displeasure over the actual incident, the board then voted to suspend Maple from this year's tournament and to put Maple Heights, and both Milkovich and his son, Mike Jr. (the Maple Jaycee coach), on two-year probation.

"But unfortunately, by the time the hearing before Judge Martin rolled around, Milkovich and Scott apparently had their version of the incident polished and reconstructed, and the judge apparently believed them.

" 'I can say that some of the stories told to the judge sounded pretty darned unfamiliar,' said Dr. Harold Meyer, commissioner of the OHSAA, who attended the hearing. 'It certainly sounded different from what they told us.'

"Nevertheless, the judge bought their story, and ruled in their favor.

"Anyone who attended the meet, whether he be from Maple Heights, Mentor, or impartial observer, knows in his heart that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth.

"But they got away with it.

"Is that the kind of lesson we want our young people learning from their high school administrators and coaches?

"I think not." App. to Pet. for Cert. A138–A139.

Supreme Court dismissed the ensuing appeal for want of a substantial constitutional question, and this Court denied certiorari. 449 U. S. 966 (1980).

On remand, relying in part on our decision in *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974), the trial court granted summary judgment to respondents on the grounds that the article was an opinion protected from a libel action by "constitutional law," App. 55, and alternatively, as a public figure, petitioner had failed to make out a prima facie case of actual malice. *Id.*, at 55–59. The Ohio Court of Appeals affirmed both determinations. *Id.*, at, 62–70. On appeal, the Supreme Court of Ohio reversed and remanded. The court first decided that petitioner was neither a public figure nor a public official under the relevant decisions of this Court. See *Milkovich* v. *News-Herald*, 15 Ohio St. 3d 292, 294–299, 473 N. E. 2d 1191, 1193–1196 (1984). The court then found that "the statements in issue are factual assertions as a matter of law, and are not constitutionally protected as the opinions of the writer. . . . The plain import of the author's assertions is that Milkovich, *inter alia*, committed the crime of perjury in a court of law." *Id.*, at 298–299, 473 N. E. 2d, at 1196–1197. This Court again denied certiorari. 474 U. S. 953 (1985).

Meanwhile, Superintendent Scott had been pursuing a separate defamation action through the Ohio courts. Two years after its *Milkovich* decision, in considering Scott's appeal, the Ohio Supreme Court reversed its position on Diadiun's article, concluding that the column was "constitutionally protected opinion." *Scott* v. *News-Herald*, 25 Ohio St. 3d 243, 254, 496 N. E. 2d 699, 709 (1986). Consequently, the court upheld a lower court's grant of summary judgment against Scott.

The *Scott* court decided that the proper analysis for determining whether utterances are fact or opinion was set forth in the decision of the United States Court of Appeals for the District of Columbia Circuit in *Ollman* v. *Evans*, 242 U. S. App. D. C. 301, 750 F. 2d 970 (1984), cert. denied, 471 U. S.

1127 (1985). See *Scott*, 25 Ohio St. 3d, at 250, 496 N. E. 2d, at 706. Under that analysis, four factors are considered to ascertain whether, under the "totality of circumstances," a statement is fact or opinion. These factors are: (1) "the specific language used"; (2) "whether the statement is verifiable"; (3) "the general context of the statement"; and (4) "the broader context in which the statement appeared." *Ibid.* The court found that application of the first two factors to the column militated in favor of deeming the challenged passages actionable assertions of fact. *Id.*, at 250–252, 496 N. E. 2d, at 706–707. That potential outcome was trumped, however, by the court's consideration of the third and fourth factors. With respect to the third factor, the general context, the court explained that "the large caption 'TD Says' . . . would indicate to even the most gullible reader that the article was, in fact, opinion." *Id.*, at 252, 496 N. E. 2d, at 707.[3] As for the fourth factor, the "broader context," the court reasoned that because the article appeared on a sports page—"a traditional haven for cajoling, invective, and hyperbole"—the article would probably be construed as opinion. *Id.*, at 253–254, 496 N. E. 2d, at 708.[4]

---

[3] The court continued:

"This position is borne out by the second headline on the continuation of the article which states: '. . . *Diadiun says* Maple told a lie.' . . . The issue, in context, was not the statement that there was a legal hearing and Milkovich and Scott lied. Rather, based upon Diadiun's having witnessed the original altercation and OHSAA hearing, it was his view that any position represented by Milkovich and Scott less than a full admission of culpability was, in his view, a lie. . . . A review of the context of the statements in question demonstrates that Diadiun is not making an attempt to be impartial and no secret is made of his bias. . . . While Diadiun's mind is certainly made up, the average reader viewing the words in their internal context would be hard pressed to accept Diadiun's statements as an impartial reporting of perjury." *Scott*, 25 Ohio St. 3d, at 252–253, 496 N. E. 2d, at 707–708 (emphasis in original).

[4] Specifically, the court reasoned as follows:

"It is important to recognize that Diadiun's article appeared on the sports page—a traditional haven for cajoling, invective, and hyperbole. . . . In this broader context we doubt that a reader would assign the same

Subsequently, considering itself bound by the Ohio Supreme Court's decision in *Scott*, the Ohio Court of Appeals in the instant proceedings affirmed a trial court's grant of summary judgment in favor of respondents, concluding that "it has been decided, as a matter of law, that the article in question was constitutionally protected opinion." 46 Ohio App. 3d, at 23, 545 N. E. 2d, at 1324. The Supreme Court of Ohio dismissed petitioner's ensuing appeal for want of a substantial constitutional question. App. 119. We granted certiorari, 493 U. S. 1055 (1990), to consider the important questions raised by the Ohio courts' recognition of a constitutionally required "opinion" exception to the application of its defamation laws. We now reverse.[5]

---

weight to Diadiun's statement as if it had appeared under the byline 'Law Correspondent' on page one of the newspaper. . . . On balance . . . a reader would not expect a sports writer on the sports page to be particularly knowledgeable about procedural due process and perjury. It is our belief that 'legal conclusions' in such a context would probably be construed as the writer's opinion." *Id.*, at 253–254, 496 N. E. 2d, at 708.

[5] Preliminarily, respondents contend that our review of the "opinion" question in this case is precluded by the Ohio Supreme Court's decision in *Scott* v. *News-Herald*, 25 Ohio St. 3d 243, 496 N. E. 2d 699 (1986). First, respondents claim that the determination by the Ohio Supreme Court in *Milkovich* v. *News-Herald*, 15 Ohio St. 3d 292, 298, 473 N. E. 2d 1191, 1196 (1984), that petitioner is not a public official or figure was overruled in *Scott*. Thus, since petitioner has failed to establish actual malice, his action is precluded under *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), and *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130 (1967). This contention is meritless. Respondents rely on the following statements made by the Ohio Supreme Court in its discussion of Scott's status as a public official: " 'To say that Milkovich nevertheless was not a public figure for purposes of discussion about the controversy is simply nonsense,' " 25 Ohio St. 3d, at 247, 496 N. E. 2d, at 704 (quoting *Milkovich* v. *Lorain Journal Co.*, 474 U. S. 953, 964 (1985) (BRENNAN, J., dissenting from denial of certiorari)), and "we overrule *Milkovich* in its restrictive view of public officials and hold a public school superintendent is a public official for purposes of defamation law." 25 Ohio St. 3d, at 248, 496 N. E. 2d, at 704. However, it is clear from the context in which these statements were made that the court was simply supporting its determination that Scott was a

Since the latter half of the 16th century, the common law has afforded a cause of action for damage to a person's reputation by the publication of false and defamatory statements. See L. Eldredge, Law of Defamation 5 (1978).

---

public official, and that as relates to petitioner Milkovich, these statements were pure dicta. But more importantly, petitioner Milkovich was not a party to the proceedings in *Scott* and thus would not be bound by anything in that ruling under Ohio law. See *Hainbuchner* v. *Miner*, 31 Ohio St. 3d 133, 137, 509 N. E. 2d 424, 427 (1987) ("It is universally recognized that a former judgment, in order to be *res judicata* in a subsequent action, must have been rendered in an action in which the parties to the subsequent action were adverse parties") (quotation omitted). Since the Ohio Court of Appeals did not address the public-private figure question on remand from the Ohio Supreme Court in *Milkovich* (because it decided against petitioner on the basis of the opinion ruling in *Scott*), the ruling of the Ohio Supreme Court in *Milkovich* presumably continues to be law of the case on that issue. See *Hawley* v. *Ritley*, 35 Ohio St. 3d 157, 160, 519 N. E. 2d 390, 393 (1988) ("[T]he decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels").

Nor is there any merit to respondents' contention that the Court of Appeals below alternatively decided there was no negligence in this case even if petitioner were regarded as a private figure, and thus the action is precluded by our decision in *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974). Although the appellate court noted that "the instant cause does not present any material issue of fact as to negligence or 'actual malice,'" *Milkovich* v. *News-Herald*, 46 Ohio App. 3d 20, 24, 545 N. E. 2d 1320, 1325 (1989), this statement was immediately explained by the court's following statement that the *Scott* ruling on the opinion issue had accorded respondents absolute immunity from liability. See 46 Ohio App. 3d, at 24, 545 N. E. 2d, at 1325. The court never made an evidentiary determination on the issue of respondents' negligence.

Next, respondents concede that the *Scott* court relied on the United States Constitution as well as the Ohio Constitution in its recognition of an opinion privilege, Brief for Respondents 18, but argue that certain statements made by the court evidenced an intent to independently rest the decision on state-law grounds, see 25 Ohio St. 3d, at 244, 496 N. E. 2d, at 701 ("We find the article to be an opinion, protected by Section 11, Article I of the Ohio Constitution . . ."); *id.*, at 245, 496 N. E. 2d, at 702 ("These ideals are not only an integral part of First Amendment freedoms under the federal Constitution but are independently reinforced in Section 11, Article I

In Shakespeare's Othello, Iago says to Othello:

"Good name in man and woman, dear my lord,
Is the immediate jewel of their souls.
Who steals my purse steals trash;
'Tis something, nothing;
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him,
And makes me poor indeed." Act III, scene 3.

Defamation law developed not only as a means of allowing an individual to vindicate his good name, but also for the purpose of obtaining redress for harm caused by such statements. Eldredge, *supra*, at 5. As the common law developed in this country, apart from the issue of damages, one usually needed only allege an unprivileged publication of false and defamatory matter to state a cause of action for defamation. See, *e. g.*, Restatement of Torts § 558 (1938); *Gertz*

---

of the Ohio Constitution . . ."), thereby precluding federal review under *Michigan* v. *Long*, 463 U. S. 1032 (1983). We similarly reject this contention. In the *Milkovich* proceedings below, the Court of Appeals relied completely on *Scott* in concluding that Diadiun's article was privileged opinion. See 46 Ohio App. 3d, at 23–25, 545 N. E. 2d, at 1324–1325. *Scott* relied heavily on federal decisions interpreting the scope of First Amendment protection accorded defamation defendants, see, *e. g.*, 25 Ohio St. 3d, at 244, 496 N. E. 2d, at 701 ("The federal Constitution has been construed to protect published opinions ever since the United States Supreme Court's opinion in *Gertz* v. *Robert Welch, Inc.* . . ."), and concluded that "[b]ased upon the totality of circumstances it is our view that Diadiun's article was constitutionally protected opinion both with respect to the federal Constitution and under our state Constitution." *Id.*, at 254, 496 N. E. 2d, at 709. Thus, the *Scott* decision was at least "interwoven with the federal law," and was not clear on its face as to the court's intent to rely on independent state grounds, yet failed to make a "plain statement . . . that the federal cases . . . [did] not themselves compel the result that the court . . . reached." *Long, supra*, at 1040–1041. Under *Long*, then, federal review is not barred in this case. We note that the Ohio Supreme Court remains free, of course, to address all of the foregoing issues on remand.

v. *Robert Welch, Inc.*, 418 U. S., at 370 (WHITE, J., dissent-
ing) ("Under typical state defamation law, the defamed pri-
vate citizen had to prove only a false publication that would
subject him to hatred, contempt, or ridicule").   The common
law generally did not place any additional restrictions on the
type of statement that could be actionable.   Indeed, defama-
tory communications were deemed actionable regardless of
whether they were deemed to be statements of fact or opin-
ion.   See, *e. g.*, Restatement of Torts, *supra*, §§ 565–567.
As noted in the 1977 Restatement (Second) of Torts § 566,
Comment *a:*

> "Under the law of defamation, an expression of opinion
> could be defamatory if the expression was sufficiently
> derogatory of another as to cause harm to his reputation,
> so as to lower him in the estimation of the community or
> to deter third persons from associating or dealing with
> him. . . . The expression of opinion was also actionable in
> a suit for defamation, despite the normal requirement
> that the communication be false as well as defama-
> tory. . . . This position was maintained even though the
> truth or falsity of an opinion—as distinguished from a
> statement of fact—is not a matter that can be objectively
> determined and truth is a complete defense to a suit for
> defamation."

However, due to concerns that unduly burdensome defa-
mation laws could stifle valuable public debate, the privilege
of "fair comment" was incorporated into the common law as
an affirmative defense to an action for defamation.   "The
principle of 'fair comment' afford[ed] legal immunity for the
honest expression of opinion on matters of legitimate public
interest when based upon a true or privileged statement of
fact."   1 F. Harper & F. James, Law of Torts § 5.28, p. 456
(1956) (footnote omitted).   As this statement implies, com-
ment was generally privileged when it concerned a matter of
public concern, was upon true or privileged facts, repre-
sented the actual opinion of the speaker, and was not made

solely for the purpose of causing harm. See Restatement of Torts, *supra*, § 606. "According to the majority rule, the privilege of fair comment applied only to an expression of opinion and not to a false statement of fact, whether it was expressly stated or implied from an expression of opinion." Restatement (Second) of Torts, *supra*, § 566, Comment *a*. Thus under the common law, the privilege of "fair comment" was the device employed to strike the appropriate balance between the need for vigorous public discourse and the need to redress injury to citizens wrought by invidious or irresponsible speech.

In 1964, we decided in *New York Times Co.* v. *Sullivan*, 376 U. S. 254, that the First Amendment to the United States Constitution placed limits on the application of the state law of defamation. There the Court recognized the need for "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.*, at 279–280. This rule was prompted by a concern that, with respect to the criticism of public officials in their conduct of governmental affairs, a state-law "'rule compelling the critic of official conduct to guarantee the truth of all his factual assertions' would deter protected speech." *Gertz* v. *Robert Welch, Inc.*, *supra*, at 334 (quoting *New York Times*, *supra*, at 279).

Three years later, in *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130 (1967), a majority of the Court determined "that the *New York Times* test should apply to criticism of 'public figures' as well as 'public officials.' The Court extended the constitutional privilege announced in that case to protect defamatory criticism of nonpublic persons 'who are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.'" *Gertz*, *supra*, at 336–337

(quoting *Butts, supra,* at 164 (Warren, C. J., concurring in result)). As Chief Justice Warren noted in concurrence, "[o]ur citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials.'" *Butts, supra,* at 164. The Court has also determined that both for public officials and public figures, a showing of *New York Times* malice is subject to a clear and convincing standard of proof. *Gertz, supra,* at 342.

The next step in this constitutional evolution was the Court's consideration of a private individual's defamation actions involving statements of public concern. Although the issue was intially in doubt, see *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29 (1971), the Court ultimately concluded that the *New York Times* malice standard was inappropriate for a private person attempting to prove he was defamed on matters of public interest. *Gertz* v. *Robert Welch, Inc., supra.* As we explained:

> "Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy.
>
> .        .        .        .        .
>
> "[More important,] public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. No such assumption is justified with respect to a private individual." *Id.,* at 344–345 (footnote omitted).

Nonetheless, the Court believed that certain significant constitutional protections were warranted in this area. First, we held that the States could not impose liability without requiring some showing of fault. See *id.,* at 347–348 ("This approach . . . recognizes the strength of the legitimate state interest in compensating private individuals for wrongful in-

jury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation"). Second, we held that the States could not permit recovery of presumed or punitive damages on less than a showing of *New York Times* malice. See 418 U. S., at 350 ("Like the doctrine of presumed damages, jury discretion to award punitive damages unnecessarily exacerbates the danger of media self-censorship . . .").

Still later, in *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U. S. 767 (1986), we held that "the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern." *Id.*, at 777. In other words, the Court fashioned "a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages." *Id.*, at 776. Although recognizing that "requiring the plaintiff to show falsity will insulate from liability some speech that is false, but unprovably so," the Court believed that this result was justified on the grounds that "placement by state law of the burden of proving truth upon media defendants who publish speech of public concern deters such speech because of the fear that liability will unjustifiably result." *Id.*, at 777–778.

We have also recognized constitutional limits on the *type* of speech which may be the subject of state defamation actions. In *Greenbelt Cooperative Publishing Assn., Inc.* v. *Bresler*, 398 U. S. 6 (1970), a real estate developer had engaged in negotiations with a local city council for a zoning variance on certain of his land, while simultaneously negotiating with the city on other land the city wished to purchase from him. A local newspaper published certain articles stating that some people had characterized the developer's negotiating position as "blackmail," and the developer sued for libel. Rejecting a contention that liability could be premised on the notion that the word "blackmail" implied the developer had committed the actual crime of blackmail, we held that "the imposition of

liability on such a basis was constitutionally impermissible—
that as a matter of constitutional law, the word 'blackmail' in
these circumstances was not slander when spoken, and not
libel when reported in the Greenbelt News Review." *Id.*, at
13. Noting that the published reports "were accurate and
full," the Court reasoned that "even the most careless reader
must have perceived that the word was no more than rhetori-
cal hyperbole, a vigorous epithet used by those who consid-
ered [the developer's] negotiating position extremely unrea-
sonable." *Id.*, at 13–14. See also *Hustler Magazine, Inc.* v.
*Falwell*, 485 U. S. 46, 50 (1988) (First Amendment precluded
recovery under state emotional distress action for ad parody
which "could not reasonably have been interpreted as stating
actual facts about the public figure involved"); *Letter Carri-
ers* v. *Austin*, 418 U. S. 264, 284–286 (1974) (use of the word
"traitor" in literary definition of a union "scab" not basis for a
defamation action under federal labor law since used "in a
loose, figurative sense" and was "merely rhetorical hyper-
bole, a lusty and imaginative expression of the contempt felt
by union members").

The Court has also determined that "in cases raising First
Amendment issues . . . an appellate court has an obligation
to 'make an independent examination of the whole record' in
order to make sure that 'the judgment does not constitute a
forbidden intrusion on the field of free expression.'" *Bose
Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S.
485, 499 (1984) (quoting *New York Times*, 376 U. S., at
284–286). "The question whether the evidence in the record
in a defamation case is sufficient to support a finding of actual
malice is a question of law." *Harte-Hanks Communica-
tions, Inc.* v. *Connaughton*, 491 U. S. 657, 685 (1989).

Respondents would have us recognize, in addition to the
established safeguards discussed above, still another First-
Amendment-based protection for defamatory statements
which are categorized as "opinion" as opposed to "fact." For

this proposition they rely principally on the following dictum from our opinion in *Gertz:*

> "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." 418 U. S., at 339–340 (footnote omitted).

Judge Friendly appropriately observed that this passage "has become the opening salvo in all arguments for protection from defamation actions on the ground of opinion, even though the case did not remotely concern the question." *Cianci* v. *New Times Publishing Co.*, 639 F. 2d 54, 61 (CA2 1980). Read in context, though, the fair meaning of the passage is to equate the word "opinion" in the second sentence with the word "idea" in the first sentence. Under this view, the language was merely a reiteration of Justice Holmes' classic "marketplace of ideas" concept. See *Abrams* v. *United States*, 250 U. S. 616, 630 (1919) (dissenting opinion) ("[T]he ultimate good desired is better reached by free trade in ideas — . . . the best test of truth is the power of the thought to get itself accepted in the competition of the market").

Thus, we do not think this passage from *Gertz* was intended to create a wholesale defamation exemption for anything that might be labeled "opinion." See *Cianci, supra,* at 62, n. 10 (The "marketplace of ideas" origin of this passage "points strongly to the view that the 'opinions' held to be constitutionally protected were the sort of thing that could be corrected by discussion"). Not only would such an interpretation be contrary to the tenor and context of the passage, but it would also ignore the fact that expressions of "opinion" may often imply an assertion of objective fact.

If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts

upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'" See *Cianci, supra*, at 64. It is worthy of note that at common law, even the privilege of fair comment did not extend to "a false statement of fact, whether it was expressly stated or implied from an expression of opinion." Restatement (Second) of Torts, § 566, Comment *a* (1977).

Apart from their reliance on the *Gertz* dictum, respondents do not really contend that a statement such as, "In my opinion John Jones is a liar," should be protected by a separate privilege for "opinion" under the First Amendment. But they do contend that in every defamation case the First Amendment mandates an inquiry into whether a statement is "opinion" or "fact," and that only the latter statements may be actionable. They propose that a number of factors developed by the lower courts (in what we hold was a mistaken reliance on the *Gertz* dictum) be considered in deciding which is which. But we think the "'breathing space'" which "'[f]reedoms of expression require in order to survive,'" *Hepps*, 475 U. S., at 772 (quoting *New York Times, supra*, at 272), is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between "opinion" and fact.

Foremost, we think *Hepps* stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defend-

20

ant is involved.[6]   Thus, unlike the statement, "In my opinion Mayor Jones is a liar," the statement, "In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin," would not be actionable.   *Hepps* ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.[7]

Next, the *Bresler-Letter Carriers-Falwell* line of cases provides protection for statements that cannot "reasonably [be] interpreted as stating actual facts" about an individual. *Falwell*, 485 U. S., at 50.   This provides assurance that public debate will not suffer for lack of "imaginative expression" or the "rhetorical hyperbole" which has traditionally added much to the discourse of our Nation.   See *id.*, at 53–55.

The *New York Times-Butts-Gertz* culpability requirements further ensure that debate on public issues remains "uninhibited, robust, and wide-open."   *New York Times*, 376 U. S., at 270.   Thus, where a statement of "opinion" on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth.   Similarly, where such a statement involves a private figure on a matter of public concern, a plaintiff must show that the false connotations were made with some level of fault

---

[6] In *Hepps* the Court reserved judgment on cases involving nonmedia defendants, see 475 U. S., at 779, n. 4, and accordingly we do the same. Prior to *Hepps*, of course, where public-official or public-figure plaintiffs were involved, the *New York Times* rule already required a showing of falsity before liability could result.   475 U. S., at 775.

[7] We note that the issue of falsity relates to the *defamatory* facts implied by a statement.   For instance, the statement, "I think Jones lied," may be provable as false on two levels.   First, that the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied.   It is, of course, the second level of falsity which would ordinarily serve as the basis for a defamation action, though falsity at the first level may serve to establish malice where that is required for recovery.

as required by *Gertz*.[8]    Finally, the enhanced appellate review required by *Bose Corp.* provides assurance that the foregoing determinations will be made in a manner so as not to "constitute a forbidden intrusion of the field of free expression." *Bose Corp.*, 466 U. S., at 499 (quotation omitted).

We are not persuaded that, in addition to these protections, an additional separate constitutional privilege for "opinion" is required to ensure the freedom of expression guaranteed by the First Amendment.    The dispositive question in the present case then becomes whether a reasonable factfinder could conclude that the statements in the Diadiun column imply an assertion that petitioner Milkovich perjured himself in a judicial proceeding.    We think this question must be answered in the affirmative.    As the Ohio Supreme Court itself observed: "[T]he clear impact in some nine sentences and a caption is that [Milkovich] 'lied at the hearing after . . . having given his solemn oath to tell the truth.'" *Scott*, 25 Ohio St. 3d, at 251, 496 N. E. 2d, at 707.    This is not the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury.    Nor does the general tenor of the article negate this impression.

We also think the connotation that petitioner committed perjury is sufficiently factual to be susceptible of being proved true or false.    A determination whether petitioner lied in this instance can be made on a core of objective evidence by comparing, *inter alia*, petitioner's testimony before the OHSAA board with his subsequent testimony before the trial court.    As the *Scott* court noted regarding the plaintiff in that case: "[W]hether or not H. Don Scott did indeed perjure himself is certainly verifiable by a perjury action with evidence adduced from the transcripts and witnesses present at

---

[8] Of course, the limitations on presumed or punitive damages established by *New York Times* and *Gertz* also apply to the type of statements at issue here.

the hearing. Unlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event." *Id.*, at 252, 496 N. E. 2d, at 707. So too with petitioner Milkovich.[9]

The numerous decisions discussed above establishing First Amendment protection for defendants in defamation actions surely demonstrate the Court's recognition of the Amendment's vital guarantee of free and uninhibited discussion of public issues. But there is also another side to the equation; we have regularly acknowledged the "important social values which underlie the law of defamation," and recognized that "[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation." *Rosenblatt* v. *Baer*, 383 U. S. 75, 86 (1966). Justice Stewart in that case put it with his customary clarity:

> "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.
>
> .        .        .        .        .
>
> "The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to re-

---

[9] In their brief, *amici* Dow Jones et al. urge us to view the disputed statements "[a]gainst the background of a high profile controversy in a small community," and says that "[t]hey related to a matter of pressing public concern in a small town." Brief for Dow Jones et al. as *Amici Curiae* 27. We do not have the same certainty as do *amici* that people in a "small town" view statements such as these differently from people in a large city. Be that as it may, however, *amici* err in their factual assumption. Maple Heights is located in Cuyahoga County, Ohio, and in the 1980 census had a population of 29,735. Mentor is located in Lake County, Ohio, and in the 1980 census had a population of 42,065. Lake County adjoins Cuyahoga County on the east, and in the 1980 census had a population of 212,801. Both Maple Heights and Mentor are included in the Cleveland standard consolidated statistical area, which in 1980 had a population of 2,834,062. The high schools of both Mentor and Maple Heights played in the Greater Cleveland Conference.

deem.   Yet, imperfect though it is, an action for dam-
ages is the only hope for vindication or redress the law
gives to a man whose reputation has been falsely dishon-
ored." *Id.*, at 92–93 (concurring opinion).

We believe our decision in the present case holds the bal-
ance true.   The judgment of the Ohio Court of Appeals is re-
versed, and the case is remanded for further proceedings not
inconsistent with this opinion.

*Reversed.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins,
dissenting.

Since this Court first hinted that the First Amendment
provides some manner of protection for statements of opin-
ion,[1] notwithstanding any common-law protection, courts
and commentators have struggled with the contours of this
protection and its relationship to other doctrines within
our First Amendment jurisprudence.   Today, for the first
time, the Court addresses this question directly and, to my
mind, does so cogently and almost entirely correctly.   I agree
with the Court that under our line of cases culminating in
*Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U. S. 767, 777
(1986), only defamatory statements that are capable of being
proved false are subject to liability under state libel law.
See *ante*, at 16.[2]   I also agree with the Court that the "state-

---

[1] See, *e. g.*, *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 292, n. 30
(1964) ("Since the Fourteenth Amendment requires recognition of the con-
ditional privilege for honest misstatements of fact, it follows that a defense
of fair comment must be afforded for honest expression of opinion based
upon privileged, as well as true, statements of fact"); *Gertz* v. *Robert
Welch, Inc.*, 418 U. S. 323, 339–340 (1974) ("Under the First Amendment
there is no such thing as a false idea.   However pernicious an opinion may
seem, we depend for its correction not on the conscience of judges and ju-
ries but on the competition of other ideas").

[2] The defendant in the *Hepps* case was a major daily newspaper and, as
the majority notes, see *ante*, at 16, the Court declined to decide whether
the rule it applied to the newspaper would also apply to a nonmedia defend-
ant.   See 475 U. S., at 779, n. 4.   I continue to believe that "such a dis-
tinction is 'irreconcilable with the fundamental First Amendment principle

ment" that the plaintiff must prove false under *Hepps* is not invariably the literal phrase published but rather what a reasonable reader would have understood the author to have said. See *ante*, at 16–17 (discussing *Greenbelt Cooperative Publishing Assn., Inc.* v. *Bresler*, 398 U. S. 6 (1970); *Letter Carriers* v. *Austin*, 418 U. S. 264 (1974); *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46 (1988)).

In other words, while the Court today dispels any misimpression that there is a so-called opinion privilege *wholly in addition* to the protections we have already found to be guaranteed by the First Amendment, it determines that a protection for statements of pure opinion is dictated by *existing* First Amendment doctrine. As the Court explains, "full constitutional protection" extends to any statement relating to matters of public concern "that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Ante*, at 20. Among the circumstances to be scrutinized by a court in ascertaining whether a statement purports to state or imply "actual facts about an individual," as shown by the Court's analysis of the statements at issue here, see *ante*, at 22, and n. 9, are the same indicia that lower courts have been relying on for the past decade or so to distinguish between statements of fact and statements of opinion: the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement was made. See, *e. g.*, *Potomac Valve & Fitting Inc.* v. *Crawford Fitting Co.*, 829 F. 2d 1280 (CA4 1987); *Janklow* v. *Newsweek, Inc.*, 788 F. 2d 1300 (CA8 1986); *Ollman* v. *Evans*, 242 U. S. App. D. C. 301, 750 F. 2d 970 (1984), cert. denied, 471 U. S. 1127 (1985).

---

that "[t]he inherent worth of . . . speech in terms of its capacity for informing the public does not depend upon the identity of the source, whether corporation, association, union, or individual." ' " *Id.*, at 780 (BRENNAN, J., concurring) (citations omitted).

With all of the above, I am essentially in agreement. I part company with the Court at the point where it applies these general rules to the statements at issue in this case because I find that the challenged statements cannot reasonably be interpreted as either stating or implying defamatory facts about petitioner. Under the rule articulated in the majority opinion, therefore, the statements are due "full constitutional protection." I respectfully dissent.

## I

As the majority recognizes, the kind of language used and the context in which it is used may signal readers that an author is not purporting to state or imply actual, known facts. In such cases, this Court has rejected claims to the contrary and found that liability may not attach "as a matter of constitutional law." *Ante*, at 17. See, *e. g.*, *Bresler, supra* (metaphor); *Letter Carriers, supra* (hyperbole); *Falwell, supra* (parody). In *Bresler*, for example, we found that Bresler could not recover for being accused of "blackmail" because the readers of the article would have understood the author to mean only that Bresler was manipulative and extremely unreasonable. See *ante*, at 16–17. In *Letter Carriers*, we found that plaintiffs could not recover for being accused of being "traitor[s]" because the newsletter's readers would have understood that the author meant that plaintiffs' accurately reported actions were reprehensible and destructive to the social fabric, not that plaintiffs committed treason. See *ante*, at 17.

Statements of belief or opinion are like hyperbole, as the majority agrees, in that they are not understood as actual assertions of fact about an individual, but they may be actionable if they *imply* the existence of false and defamatory facts. See *ante*, at 18–19. The majority provides some general guidance for identifying when statements of opinion imply assertions of fact. But it is a matter worthy of further attention

in order "to confine the perimeters of [an] unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 505 (1984). Although statements of opinion *may* imply an assertion of a false and defamatory fact, they do not *invariably* do so. Distinguishing which statements do imply an assertion of a false and defamatory fact requires the same solicitous and thorough evaluation that this Court has engaged in when determining whether particular exaggerated or satirical statements could reasonably be understood to have asserted such facts. See *Bresler, supra; Letter Carriers, supra; Falwell, supra.* As Justice Holmes observed long ago: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne* v. *Eisner*, 245 U. S. 418, 425 (1918).

For instance, the statement that "Jones is a liar," or the example given by the majority, "In my opinion John Jones is a liar"—standing alone—can reasonably be interpreted as implying that there are facts known to the speaker to cause him to form such an opinion. See *ante*, at 18–19. But a different result must obtain if the speaker's comments had instead been as follows: "Jones' brother once lied to me; Jones just told me he was 25; I've never met Jones before and I don't actually know how old he is or anything else about him, but he looks 16; I think Jones lied about his age just now." In the latter case, there are at least six statements, two of which may arguably be actionable. The first such statement is factual and defamatory and may support a defamation action by Jones' brother. The second statement, however, that "I think Jones lied about his age just now," can be reasonably interpreted in context only as a statement that the speaker infers, from the facts stated, that Jones told a particular lie. It is clear to the listener that the speaker does

not actually know whether Jones lied and does not have any other reasons for thinking he did.[3] Thus, the only fact implied by the second statement is that the speaker drew this inference. If the inference is sincere or nondefamatory, the speaker is not liable for damages.[4]

---

[3] The Restatement (Second) of Torts § 566, Comment c (1977), makes a similar observation. It explains that a statement that "I think C must be an alcoholic" is potentially libelous because a jury might find that it implies the speaker knew undisclosed facts to justify the statement. In contrast, it finds that the following statement could not be found to imply any defamatory facts:

"A writes to B about his neighbor C: 'He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic.'"

Yet even though clear disclosure of a comment's factual predicate precludes a finding that the comment implies other defamatory facts, this does not signify that a statement, preceded by only a partial factual predicate or none at all, necessarily implies other facts. The operative question remains whether reasonable readers would have actually interpreted the statement as implying defamatory facts. See ante, at 20, n. 7; see generally Note, 13 Wm. Mitchell L. Rev. 545 (1987); Comment, 74 Calif. L. Rev. 1001 (1986); Zimmerman, Curbing the High Price of Loose Talk, 18 U. C. D. L. Rev. 359 (1985).

[4] See ante, at 20, n. 7 (noting that under Philadelphia Newspapers, Inc. v. Hepps, 475 U. S. 767 (1986), "the issue of falsity relates to the defamatory facts implied by a statement" (emphasis changed)). Hepps mandates protection for speech that does not actually state or imply false and defamatory facts—independently of the Bresler-Letter Carriers-Falwell line of cases. Implicit in the constitutional rule that a plaintiff must prove a statement false to recover damages is a requirement to determine first what statement was actually made. The proof that Hepps requires from the plaintiff hinges on what the statement can reasonably be interpreted to mean. For instance, if Riley tells his friends that Smith cheats at cards and Smith then proves that he did not rob a convenience store, Smith cannot recover damages for libel on that basis because he has proved the wrong assertion false. Likewise, in the example in text, Jones cannot recover for defamation for the statement "I think Jones lied about his age just now" by producing proof that he did not lie about his age because, like Smith, he would have proved the wrong assertion false. The assertion

## II

The majority does not rest its decision today on any finding that the statements at issue explicitly state a false and defamatory fact. Nor could it. Diadiun's assumption that Milkovich must have lied at the court hearing is patently conjecture.[5] The majority finds Diadiun's statements actionable, however, because it concludes that these statements imply a factual assertion that Milkovich perjured himself at the judicial proceeding. I disagree. Diadiun not only reveals the facts upon which he is relying but he makes it clear at which point he runs out of facts and is simply guessing. Read in context, the statements cannot reasonably be interpreted as implying such an assertion as fact. See *ante*, at 5–7, n. 2 (reproducing the column).

Diadiun begins the column by noting that, on the day before, a Court of Common Pleas had overturned the decision by the Ohio High School Athletic Association (OHSAA) to suspend the Maple Heights wrestling team from that year's state tournament. He adds that the reversal was based on due process grounds. Diadiun emphasizes to the audience that he was present at the wrestling meet where the brawl that led to the team's suspension took place and that he was present at the hearing before the OHSAA. He attributes the brawl to Maple Heights coach Milkovich's wild gestures, ranting and egging the crowd on against the competing team from Mentor. He then describes Milkovich's testimony before the OHSAA, characterizing it as deliberate misrepresen-

---

Jones must prove false is that the speaker had, in fact, drawn the inference that Jones lied.

[5] Conjecture, when recognizable as such, alerts the audience that the statement is one of belief, not fact. The audience understands that the speaker is merely putting forward a hypothesis. Although the hypothesis involves a factual question, it is understood as the author's "best guess." Of course, if the speculative conclusion is preceded by stated factual premises, and one or more of them is false and defamatory, an action for libel may lie *as to them*. But the speculative conclusion itself is actionable only if it implies the existence of another false and defamatory fact.

tation "attempting not only to convince the board of [his] own innocence, but, incredibly, shift the blame of the affair to Mentor." *Ante,* at 6, n. 2. Diadiun then quotes statements allegedly made by Milkovich to the commissioners to the effect that his wrestlers had not been involved in the fight and his gestures had been mere shrugs.

At that point in the article, the author openly begins to surmise. Diadiun says that it *"seemed"* that Milkovich's and another official's story contained enough contradictions and obvious untruths that the OHSAA board was able to see through it and that *"[p]robably"* the OHSAA's suspension of the Maple Heights team reflected displeasure as much at the testimony as at the melee. *Ante,* at 7, n. 2 (emphasis added). Then Diadiun guesses that by the time of the court hearing, the two officials *"apparently* had their version of the incident polished and reconstructed, and the judge *apparently* believed them." *Ibid.* (emphasis added). For the first time, the column quotes a third party's version of events. The source, an OHSAA commissioner, is described—in evident contrast to Diadiun—as having attended the proceeding. The column does not quote any testimony from the court proceeding, nor does it describe what Milkovich said in court. There is only a vague statement from the OHSAA commissioner that the testimony "sounded pretty darned unfamiliar." [6] For the first time, Diadiun fails

---

[6] The commissioner is quoted as having said: "'I can say that some of the stories told to the judge sounded pretty darned unfamiliar . . . . It certainly sounded different from what they told us.'" *Ante,* at 7, n. 2. This quotation might also be regarded as a stated factual premise on which Diadiun's speculation is based. However, Milkovich did not complain of the quotation in his pleadings. In any event, it is unlikely that it would be found defamatory. Diadiun had already characterized the testimony of the two officials before the OHSAA as "obvious untruths." Thus, the commissioner's alleged assertion that the testimony in court was different is quite nebulous. It might indicate that the officials told the truth in court, in contrast to the version given to the commissioners, or that the

to claim any firsthand knowledge, after stressing that he had personally attended both the meet and the OHSAA hearing. After noting again that the judge ruled in Milkovich's and Maple Heights' favor, Diadiun proclaims: "Anyone who attended the meet, whether he be from Maple Heights, Mentor, or impartial observer, knows in his heart that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth." *Ibid.*

No reasonable reader could understand Diadiun to be impliedly asserting—as fact—that Milkovich had perjured himself. Nor could such a reader infer that Diadiun had further information about Milkovich's court testimony on which his belief was based. It is plain from the column that Diadiun did not attend the court hearing. Diadiun also clearly had no detailed secondhand information about what Milkovich had said in court. Instead, what suffices for "detail" and "color" are quotations from the OHSAA hearing— old news compared to the court decision which prompted the column—and a vague quotation from an OHSAA commissioner. Readers could see that Diadiun was focused on the court's reversal of the OHSAA's decision and was angrily supposing what must have led to it.[7]

---

officials discussed entirely different issues, rather than that they told a new lie.

[7] Both state and federal courts have found that audiences can recognize conjecture that neither states nor implies any assertions of fact, just as they can recognize hyperbole. For example, in *Potomac Valve & Fitting Inc.* v. *Crawford Fitting Co.*, 829 F. 2d 1280, 1290 (CA4 1987), the court found that a disparaging statement about a product test in an industry newsletter, set forth following a list of seven observations about the test's methodology, "readily appears to be nothing more than the author's personal inference from the test results. The premises are explicit, and the reader is by no means required to share [the author's] conclusion." For the same reason, the court in *Dunlap* v. *Wayne*, 105 Wash. 2d 529, 540, 716 P. 2d 842, 849 (1986), concluded: "Arguments for actionability disappear when the audience members know the facts underlying an assertion and can judge the truthfulness of the allegedly defamatory statement themselves." See also *National Assn. of Government Employees, Inc.* v. *Cen-*

Even the insinuation that Milkovich had repeated, in court, a more plausible version of the misrepresentations he had made at the OHSAA hearing is preceded by the cautionary term "apparently"—an unmistakable sign that Diadiun did not know what Milkovich had actually said in court.  "[C]autionary language or interrogatories of this type put the reader on notice that what is being read is opinion and thus weaken any inference that the author possesses knowledge of damaging, undisclosed facts. . . . In a word, when the reasonable reader encounters cautionary language, he tends to 'discount that which follows.'"  *Ollman* v. *Evans*, 242 U. S. App. D. C., at 314, 750 F. 2d, at 983, quoting *Burns* v. *McGraw-Hill Broadcasting Co.*, 659 P. 2d 1351, 1360 (Colo. 1983).  See also B. Sanford, Libel and Privacy: The Prevention and Defense of Litigation 145 (1987) (explaining that many courts have found that words like "apparent" reveal "that the assertion is qualified or speculative and is not to be understood as a declaration of fact"); *Information Control Corp.* v. *Genesis One Computer Corp.*, 611 F. 2d 781, 784 (CA9 1980) (explaining that a statement phrased in language of apparency "is less likely to be understood as a statement of

*tral Broadcasting Corp.*, 379 Mass. 220, 226, 396 N. E. 2d 996, 1000 (1979) (finding that, as listeners were told the facts upon which a radio talk show host based her conclusion, they "could make up their own minds and generate their own opinions or ideas which might or might not accord with [the host's]").

The common-law doctrine of fair comment was also premised on such an observation.  Where the reader knew or was told the factual foundation for a comment and could therefore independently judge whether the comment was reasonable, a defendant's unreasonable comment was held to defame "'himself rather than the subject of his remarks.'"  Hill, Defamation and Privacy Under the First Amendment, 76 Colum. L. Rev. 1205, 1229 (1976) (quoting *Popham* v. *Pickburn*, 7 H. & N. 891, 898, 158 Eng. Rep. 730, 733 (Ex. 1862) (Wilde, B.)).  "As Thomas Jefferson observed in his first Inaugural Address . . . error of opinion need not and ought not be corrected by the courts 'where reason is left free to combat it.'"  *Potomac, supra*, at 1288–1289, quoting Thomas Jefferson's first Inaugural Address (The Complete Jefferson 385 (S. Padover ed. 1943)).

fact rather than as a statement of opinion"); *Gregory* v. *Mc-Donnell Douglas Corp.*, 17 Cal. 3d 596, 603, 552 P. 2d 425, 429 (1976) (finding a letter "cautiously phrased in terms of apparency" did not imply factual assertions); *Stewart* v. *Chicago Title Ins. Co.*, 151 Ill. App. 3d 888, 894, 503 N. E. 2d 580, 583 (1987) (finding a letter "couched in language of opinion rather than firsthand knowledge" did not imply factual assertions). Thus, it is evident from what Diadiun actually wrote that he had no unstated reasons for concluding that Milkovich perjured himself.

Furthermore, the tone and format of the piece notify readers to expect speculation and personal judgment. The tone is pointed, exaggerated, and heavily laden with emotional rhetoric and moral outrage. Diadiun never says, for instance, that Milkovich committed perjury. He says that "[a]nyone who attended the meet . . . knows in his heart" that Milkovich lied—obvious hyperbole as Diadiun does not purport to have researched what everyone who attended the meet knows in his heart.

The format of the piece is a signed editorial column with a photograph of the columnist and the logo "TD Says." Even the headline on the page where the column is continued— "Diadiun says Maple told a lie," *ante*, at 4—reminds readers that they are reading one man's commentary. While signed columns may certainly include statements of fact, they are also the "well recognized home of opinion and comment." *Mr. Chow of New York* v. *Ste. Jour Azur S. A.*, 759 F. 2d 219, 227 (CA2 1985). Certain formats—editorials, reviews, political cartoons, letters to the editor—signal the reader to anticipate a departure from what is actually known by the author as fact. See *Ollman* v. *Evans, supra*, at 317, 750 F. 2d, at 986 ("The reasonable reader who peruses [a] column on the editorial or Op-Ed page is fully aware that the statements found there are not 'hard' news like those printed on the front page or elsewhere in the news sections of the newspaper"); R. Smolla, Law of Defamation § 6.12(4), n. 252 (1990) (col-

lecting cases); Zimmerman, Curbing the High Price of Loose Talk, 18 U. C. D. L. Rev. 359, 442 (1985) (stressing the need to take into account "the cultural common sense of the ordinary listener or reader").[8]

### III

Although I agree with the majority that statements must be scrutinized for implicit factual assertions, the majority's scrutiny in this case does not "hol[d] the balance true," *ante*, at 23, between protection of individual reputation and freedom of speech. The statements complained of neither state nor imply a false assertion of fact, and, under the rule the Court reconfirms today, they should be found not libel "'as a matter of constitutional law.'" *Ante*, at 17, quoting *Bresler*, 398 U. S., at 13. Readers of Diadiun's column are signaled repeatedly that the author does not actually know what Milkovich said at the court hearing and that the author is surmising, from factual premises made explicit in the column, that Milkovich must have lied in court.[9]

---

[8] The readers of Diadiun's column would also have been alerted to regard any implicit claim of impartiality by Diadiun with skepticism because Diadiun's newspaper is published in the county in which Mentor High School—home to the team that was allegedly mauled at the wrestling meet—is located. Where readers know that an author represents one side in a controversy, they are properly warned to expect that the opinions expressed may rest on passion rather than factual foundation. See, *e. g.*, *Potomac Valve & Fitting Inc.* v. *Crawford Fitting Co.*, 829 F. 2d, at 1290 (explaining that the contents of a company's newsletter would be understood as reflecting the professional interests of the company rather than as "a dispassionate and impartial assessment" of a test of a competitor's product); *Information Control Corp.* v. *Genesis One Computer Corp.*, 611 F. 2d 781, 784 (CA9 1980) (recognizing that statements in the early weeks of litigation by one side about the other were likely to include unsubstantiated charges, but that these "are highly unlikely to be understood by their audience as statements of fact").

[9] Milkovich does not challenge the accuracy of any of Diadiun's stated premises. Nor does he complain or proffer proof that Diadiun had not, in fact, concluded from the stated premises that Milkovich must have lied in court. There is, therefore, no call to consider under what circumstances

34

Like the "imaginative expression" and the "rhetorical hyperbole" which the Court finds have "traditionally added much to the discourse of our Nation," *ante*, at 18, conjecture is intrinsic to "the free flow of ideas and opinions on matters of public interest and concern" that is at "the heart of the First Amendment." *Falwell*, 485 U. S., at 50. The public and press regularly examine the activities of those who affect our lives. "One of the perogatives of American citizenship is the right to criticize men and measures." *Id.*, at 51 (quoting *Baumgartner* v. *United States*, 322 U. S. 665, 673–674 (1944)). But often only some of the facts are known, and solely through insistent prodding—through conjecture as well as research—can important public questions be subjected to the "uninhibited, robust, and wide-open" debate to which this country is profoundly committed. *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964).

Did NASA officials ignore sound warnings that the Challenger Space Shuttle would explode? Did Cuban-American

---

an insincere speculation would constitute a false and defamatory statement under *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U. S. 767 (1986). However, I would think that documentary or eyewitness testimony that the speaker did not believe his own professed opinion would be required before a court would be permitted to decide that there was sufficient evidence to find that the statement was false and submit the question to a jury. Without such objective evidence, a jury's judgment might be too influenced by its view of what was said. As we have long recognized, a jury "is unlikely to be neutral with respect to the content of speech and holds a real danger of becoming an instrument for the suppression of those 'vehement, caustic, and sometimes unpleasantly sharp attacks,' . . . which must be protected if the guarantees of the First and Fourteenth Amendments are to prevail." *Monitor Patriot Co.* v. *Roy*, 401 U. S. 265, 277 (1971) (quoting *New York Times*, 376 U. S., at 270). See also *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 510–511, and n. 29 (1984) (discussing the risks of submitting various questions to juries where freedom of speech is at stake); *Gertz*, 418 U. S., at 349 (expressing concern about juries punishing unpopular opinion rather than compensating individuals for injuries sustained by the publication of a false fact); R. Smolla, Law of Defamation §§ 6.05(3)(a)–(c) (1990); Zimmerman, 18 U. C. D. L. Rev., at 430.

leaders arrange for John Fitzgerald Kennedy's assassination? Was Kurt Waldheim a Nazi officer? Such questions are matters of public concern long before all the facts are unearthed, if they ever are. Conjecture is a means of fueling a national discourse on such questions and stimulating public pressure for answers from those who know more. " 'The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.' " *Id.*, at 269 (quoting *Stromberg* v. *California*, 283 U. S. 359, 369 (1931)).

What may be more disturbing to some about Diadiun's conjecture than, say, an editorial in 1960 speculating that Francis Gary Powers was in fact a spy, despite the Government's initial assurances that he was not, is the naiveté of Diadiun's conclusion. The basis of the court decision that is the subject of Diadiun's column was that Maple Heights had been denied its right to due process by the OHSAA. Diadiun, as it happens, not only knew this but included it in his column. But to anyone who knows what "due process" means, it does not follow that the court must have believed some lie about what happened at the wrestling meet, because what happened at the meet would not have been germane to the questions at issue. There may have been testimony about what happened, and that testimony may have been perjured, but to anyone who understands the patois of the legal profession there is no reason to assume—from the court's decision—that such testimony must have been given.

Diadiun, therefore, *is* guilty. He is guilty of jumping to conclusions, of benightedly assuming that court decisions are always based on the merits, and of looking foolish to lawyers. He is not, however, liable for defamation. Ignorance, without more, has never served to defeat freedom of speech. "The constitutional protection does not turn upon 'the truth, popularity, or social utility of the ideas and beliefs which are

offered.'" *New York Times, supra,* at 271 (quoting *NAACP* v. *Button,* 371 U. S. 415, 445 (1963)).

I appreciate this Court's concern with redressing injuries to an individual's reputation. But as long as it is clear to the reader that he is being offered conjecture and not solid information, the danger to reputation is one we have chosen to tolerate in pursuit of "'individual liberty [and] the common quest for truth and the vitality of society as a whole.'" *Falwell, supra,* at 50–51 (quoting *Bose Corp.,* 466 U. S., at 503–504). Readers are as capable of independently evaluating the merits of such speculative conclusions as they are of evaluating the merits of pure opprobrium. Punishing such conjecture protects reputation only at the cost of expunging a genuinely useful mechanism for public debate. "In a society which takes seriously the principle that government rests upon the consent of the governed, freedom of the press must be the most cherished tenet." *Edwards* v. *National Audubon Society, Inc.,* 556 F. 2d 113, 115 (CA2), cert. denied *sub nom. Edwards* v. *New York Times Co.,* 434 U. S. 1002 (1977).

It is, therefore, imperative that we take the most particular care where freedom of speech is at risk, not only in articulating the rules mandated by the First Amendment, but also in applying them. "'Whatever is added to the field of libel is taken from the field of free debate.'" *New York Times, supra,* at 272 (quoting *Sweeney* v. *Patterson,* 76 U. S. App. D. C. 23, 24, 128 F. 2d 457, 458, cert. denied, 317 U. S. 678 (1942)). Because I would affirm the Ohio Court of Appeals' grant of summary judgment to respondents, albeit on somewhat different reasoning, I respectfully dissent.