Marie–Therese Assa'ad FALTAS,
MD, MPH, Plaintiff,

v.

The STATE NEWSPAPER, in its corporate capacity; Katherine Gray; Claudia Smith Brinson; Patrick Blanchat; Thomas McLean; and William Rhone, individually and as agent of The State Newspaper; and Chris Riley; and other unknown-named persons, Defendant.

Civ. A. No. 0:95–3324–17.

United States District Court,
D. South Carolina,
Columbia Division.

May 20, 1996.

Marie–Therese Assa'ad Faltas, MD, MPH, Columbia, South Carolina, pro se.

Jerry Jay Bender, Belser, Baker, Barwick, Ravenel & Bender, Columbia, S.C., for defendants The State Newspaper, Katherine Gray, Claudia Smith Brinson, and Patrick Blanchat.

Ilene Stacey King, Peter Tepley, Turnipseed & Associates, Columbia, South Carolina, for defendant Chris Riley.

## MEMORANDUM OPINION AND ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

This matter is before the court on all parties' cross motions for summary judgment. A variety of other motions are also before the court. All parties have been given a full opportunity to brief the issues. The court has carefully reviewed the briefs, has heard oral argument on all motions, and has fully considered the issues raised. For the reasons stated below, this court concludes that plaintiff's motion for summary judgment should be denied, that defendants' motions for summary judgment should be granted and that the case should be dismissed with prejudice. All other motions are rendered moot by this order.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The nonmoving party, here the plaintiff, must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also*

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

To survive summary judgment, a party cannot rest on mere conjecture. This is true even as to claims which can normally only be proven by circumstantial evidence such as claims of conspiracy. In short, a party cannot prove his case "only through speculation and the piling of inferences." *Hinkle v. City of Clarksburg,* 81 F.3d 416, 426 (4th Cir. April 17, 1996).

 Summary judgment "is especially appropriate in libel cases, for prolonging a meritless case through trial could result in further chilling of First Amendment rights." *Anderson v. Stanco Sports Library, Inc.,* 542 F.2d 638 (4th Cir.1976). In First Amendment cases, "[t]he question whether the evidence in the record ... is sufficient to support a finding of actual malice is a question of law." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 17, 110 S.Ct. 2695, 2704–05, 111 L.Ed.2d 1 (1990) *quoting Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 685, 109 S.Ct. 2678, 2694–95, 105 L.Ed.2d 562 (1989).

## FACTS IN THE LIGHT MOST FAVORABLE TO PLAINTIFF

For purposes of this motion, all facts are taken in the light most favorable to plaintiff. The central facts are discussed below.

### The parties.

Plaintiff is a medical doctor (M.D.) and a Master of Public Health (M.P.H.). She is of Egyptian national origin, is of the Coptic race, and is an Orthodox Christian Catholic. At the time the events at issue in this action began, plaintiff was employed as a resident at the University of South Carolina ("USC") School of Medicine. This employment was terminated in or around November, 1993 after most of the events at issue in this case occurred.[1]

Defendants consist of *The State–Record Company* (identified in the caption and herein as *"The State* newspaper" or *"The State"*), several of its writers and editors, and one individual who wrote a letter to the editor which was published by *The State* newspaper. This last individual, Chris Riley, is not otherwise associated with the newspaper.

### Plaintiff's publications and access to the media.

In January 1993, while employed by USC, plaintiff called in to Dr. Linda Austin's live broadcast program on South Carolina Educational Radio. The topic of that particular show was homosexuals in the military. Plaintiff appeared on the next show as Dr. Austin's guest and spoke on the topic of homosexuality. Plaintiff then contacted *The State* newspaper and offered to provide them with her "meta-analysis of homosexual behavior."

The article was rejected in its original form as too technical and too lengthy (approximately 2000 words). The newspaper, however, advised plaintiff by letter that the article would be reconsidered if shortened to between 500 and 700 words. In this letter, Kent Krell, an associate editor, stated that the article "would, I am sure, stimulate controversy and colloquy among a segment of our readers." Letter dated May 3, 1993 (attachment 2 to plaintiff's memorandum in opposition to the newspaper defendants' motion for summary judgment). Plaintiff, thereafter, rewrote and resubmitted her piece, shortening it to approximately 900 words. In her letter which accompanied the resubmitted piece, plaintiff stated "I think the halving made it much less juicy."

Plaintiff's article was published on May 12, 1993 as an opinion piece in the editorial section (generally referred to as an "op-ed" piece). The article was titled "Sexual Normalcy Wrongly Interpreted in Previous Stud-

1. The present action consists of claims this court severed from another action which alleges claims against, *inter alia,* plaintiff's supervisors and other persons employed by USC. *Faltas v. The Attorney General of Virginia,* CA No. 95–CV–1521–17. That action asserts claims alleging interference with plaintiff's employment at USC as well as interference with her right to appeal termination of her employment at USC. Plaintiff pursued direct claims against her employer in an earlier action. *Fares & Faltas v. University of South Carolina,* CA No. 94–CV–1578–17BC. In some instances, this order refers to plaintiff's discovery responses in these other cases.

ies." In her article, plaintiff introduced herself and her article as follows:

> Most people, doctors included, have until now been afraid to ask what the Kinsey study really found. That terrorized them into repeating that 10 percent of the universe is born homosexual and the only thing to do about that is to accept it. Now, faced with better studies that reduced that figure to 1 percent, they think that either percentage is valid and may be chosen according to preference.
>
> Preference may be a proper judge of art, but not of science. Biostatistical studies apply mathematics to understand the where, when and why of what happens to people. Evaluation of studies of human sexual behavior requires medical knowledge, as well.
>
> *As far as I can determine, there is presently one person in South Carolina who is fully trained both as a medical doctor and a biostatistician. I am that person. So pay attention, but be warned: This article may be hazardous to your political correctness and confidence in your notions of sexual normalcy.*

(Emphasis added).

The article then discussed the numerous fallacies Dr. Faltas perceived in the Kinsey Report.[2] Dr. Faltas' stated concerns centered on the methods of gathering and analyzing data which she contended led to a biased sample and skewed results. For instance, she discredited Kinsey's study as "hopelessly nonrepresentative" and stated that recent studies disagreed with Kinsey "essentially on every point where study design matters."

Dr. Faltas also challenged another, apparently smaller, study. Her statement in this regard led to the responsive letter most central to the present case:

> Consider the fallacy of one study of the brains of homosexual men who had died of AIDS. While it found a hormone sensitive part of the "gay brain" to be midway between straight men and women, *it forgot that gay subjects are likely to have taken*

*estrogens during their lifetime* to achieve a feminine look and sound. So it isn't that they were born with different brains and therefore had to behave differently; it is that, in the process of facilitating a different behavior, they had to change their looks and changed their brains in the bargain.

(Emphasis added).

The following day, on May 13, 1993, plaintiff gave an interview on South Carolina Educational Radio. *See* Plaintiff's Answers to Local Rule Interrogatories in *Faltas v. The Attorney General of Virginia,* CA No. 95–1521 (hereinafter Pltf Local Rule Resp in CA 95–1521) at 9. Plaintiff was invited, on the air, to appear on another show. *Id.*

**The readers' responses.**

*The State* newspaper ultimately published four critical responses to plaintiff's May 12 op-ed piece. These responses were in the form of letters to the editor. The author of one of those letters, Chris Riley, is one of the defendants in the present action. Plaintiff's allegations against the other defendants (the newspaper and several of its employees) include allegations related to the other letters. None of the authors of the other letters are, however, defendants in this action.

Chris Riley's letter to the editor was published on May 23, 1993. This letter first criticized the newspaper itself for beginning "a campaign of homophobia." It then addressed Dr. Faltas' op-ed piece as follows:

> [O]n May 12, Marie Faltas in her op/ed piece amazed us with her spurious and twisted logic. When she stated that gay men are likely to have taken estrogen, *she offered no statistics to back up her claim and showed us how much she will lie to suit her agenda.* The study that she espoused as the truth—the study that claims that only 1 percent of the population is gay—did not have a representative population or a scientifically correct questioning method. *Dr Faltas views her status as physician as an opportunity to present lies as truth.*

---

**2.** Although Dr. Faltas does not explicitly identify "the Kinsey Report," she apparently refers to the book entitled *Sexual Behavior in the Human Male* which was authored by Kinsey, Pomeroy and Martin and was published by W.B. Saunders Company in 1948.

Shame on *The State*. Shame on Marie Faltas. These attacks only show that gays need their civil rights protected from right-wing bigots, and hate-filled epistles like Faltas' only show how dire the need is.

(Emphasis added).

On June 4, 1993, another letter was published in *The State* newspaper criticizing Dr. Faltas' article. It contained the following language:

Reading the guest editorial of Dr. Marie Faltas (May 12) gave me a great feeling of discomfort. I do not think that anyone is the final authority on any subject.

\* \* \* \* \* \*

I would like to gently suggest that Dr. Faltas' *discourse sounded more like the ranting of a Middle–Eastern cleric than the reasoning of a scientist.* By printing that discourse, I believe *The State* did a disservice to its readers. *I feel as if the World Trade Center car bomb exploded on the editorial page. Let's leave the irrational hate mongering in the Middle East.* We don't need that in Columbia, South Carolina.

(Emphasis added).

Two more responsive letters were printed on June 7, 1993. The first of these reads as follows:

If Dr. Faltas is what she claims to be—"the one person in the state to be fully trained both as a medical doctor and a biostatistician"—let's do without one. If she was educated at any of our institutions of higher education, fire her teachers, too. She does not deserve the degrees.

After an essay on the unreliability of sexual studies, Faltas comes to the *entirely unsubstantiated* conclusion that homosexuality is predetermined in no more than one-tenth of 1 percent of births. Not a shred of medical or statistical data is offered to substantiate that claim.

The other letter published on June 7, 1993, also *criticizes* Dr. Faltas' *conclusions* and states that:

·For someone who claims to be 'fully trained as a medical doctor and a biostatistician,' Marie A. Faltas sure has a lot to learn. I read her comments on the May 12 Insight/Opinion page with a mixture of disgust and amusement.... Most astonishing was her remark that "gay (male) subjects are likely to have taken estrogens during their lifetime (sic) to achieve a feminine look and sound." This is either a joke or a lie; and either way, this sort of fabrication has no place on the op/ed page.

**Plaintiff's opportunity for rebuttal**

Dr. Faltas thereafter contacted the paper regarding printing a rebuttal to the above letters, particularly to defendant Riley's letter. Her letter read, in part, as follows:

Since *The State* failed to fulfil its promise that "letters *will* be edited for ... libel," I must insist that this response to Chris Riley's letter ... be run in its full length and immediately.

\* \* \* \* \* \*

I deferred to *The State's* editorial judgment in shortening my original article to a drop of scholarship on a subject drowned in a sea of demagogery [sic]. Still, the word used in reference to the "one study"—and one is all that was done to date—on the brains of homosexual men who had died of AIDS is "subjects."

\* \* \* \* \* \*

What must be made clear here are the different responsibilities of an author of a study, of a peer reviewer *before* the study is published, and of a critiquer *after* the study is published. As the latter, I can only go by the published text of the study and *must* assume that any and all plausible sources of error and alternative conclusions that he did not account for were **incompetently or dishonestely [sic] overlooked.**

\* \* \* \* \* \*

What *I got* for my scholarly review of the matter is demoted from Chief Resident of Preventive Medicine at U.S.C. while *The State* worries about academic freedom at the University of Pennsylvania.

Plaintiff's Letter to Katheryn Gray and Kent Krell (attachment 4 to Plaintiff's Opposition to The State Newspaper Defendants' Rule 56

and 12(c) Motions, filed February 1, 1996) (italics in original, bold emphasis added).

By letter dated June 3, 1993, *The State* offered to allow plaintiff to publish her own response in the form of a letter to the editor but would not allow her another lengthy article. That letter concluded:

> You have been free to express your opinion, and some readers have expressed theirs. As I told you by telephone, and as Ms. Gray told you, we do not intend to publish your second lengthy submission. That would set off another round of public discourse, which you have found not to your liking after initially beseeching us to publish your thoughts.
>
> I will, however, consider printing a briefer response from you—your own Letter to the Editor. It must be under the 250–word limit normally imposed on letters.

Letter of Thomas N. McLean, Editorial Page Editor, dated June 3, 1993 (Exhibit A to Defendant's answers to plaintiff's interrogatory 1, attached to Riley's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment). Plaintiff did not submit such a letter. McLean Affidavit.

A little over a month later, on July 14, 1993, plaintiff appeared as a guest on WVOC's "John Wrisley Live" call-in radio show. At the conclusion of that show, plaintiff was asked to appear again. Pltf Local Rule Resp in CA 95–1521 at 15–16.

**Events following the publication of the article and responsive letters**

A member of the faculty at USC later confronted Dr. Faltas with one or more of the above quoted letters to the editor criticizing plaintiff's article. Complaint Count A ¶ 4. According to the complaint, this faculty member specifically stated that the letter would affect plaintiff's employment "because it shows that [plaintiff's] writing is irresponsible and hurts people's feelings." *Id.* Some of these letters made their way into plaintiff's personnel file at the USC Medical School with a notation by another faculty member. *See* Plaintiff's Memorandum in Opposition to

Riley's Rule 56 Motion at 2 (affidavit) and attachments 1 & 2 (although plaintiff describes the attachments as the Riley letter with an added notation, the attached document is instead a copy of two other letters published on other dates).

Plaintiff's employment with the University was then terminated. Plaintiff challenged that termination, alleging, *inter alia,* that she was terminated for exercising her First Amendment rights by speaking and writing on the subject of homosexuality. *See generally Fares & Faltas v. USC,* CA No. 94–1578 (DSC); and *Faltas v. Attorney General of Virginia,* CA No. 95–1521 (DSC).

Someone, whose name is not revealed, apparently wrote to the newspaper in regard to plaintiff's termination. Complaint Count A ¶¶ 7–8. A responsive letter containing the following statement was sent to that person:

> Regarding your letter to the editor about Dr. Marie Faltas, we investigated the reasons for her termination and determined it had nothing to do with her op-ed piece.

Complaint Exhibit 2 (letter by defendant Blanchet). That unnamed person gave the responsive letter to plaintiff. Complaint Count A ¶ 7. There is nothing in the complaint or record to suggest this letter was disseminated by the newspaper to anyone other than the unnamed person to whom the letter was addressed. Neither is there any evidence of damages such as a lowering of the unnamed person's opinion of plaintiff.[3]

## DISCUSSION

**I. PLAINTIFF'S DEFAMATION CLAIMS AGAINST RILEY AND THE NEWSPAPER DEFENDANTS**

Plaintiff alleges that Riley and several of the newspaper defendants defamed her by printing Riley's letter and by sending Blanchet's letter to the unnamed reader. Complaint Count A ¶¶ 3 & 7. In particular, plaintiff challenges Riley's statements that plaintiff *"will lie to suit her agenda"* and "views her status as a physician as an opportunity to *present lies as truth."* (Emphasis

---

3. Although there has been only very limited discovery to date, plaintiff would be expected to have at least some evidence of any injury to

reputation directly available to her. This is particularly true since plaintiff received the responsive letter directly from this person.

added). Although the complaint references other letters, these are not the subject of the defamation claim.[4]

### A. The applicable legal standard is dependent on whether plaintiff is a "public figure."

■ Plaintiff's claim is brought pursuant to South Carolina law of defamation. *E.g. Constant v. Spartanburg Steel Products Inc.,* 316 S.C. 86, 447 S.E.2d 194 (1994) (cited by plaintiff for the proposition that damages in a *per se* defamation case are presumed) *cert. denied* —— U.S. ——, 115 S.Ct. 580, 130 L.Ed.2d 495 (1994); *Beckham v. Sun News,* 289 S.C. 28, 344 S.E.2d 603 (S.C.1986) (cited by plaintiff for the proposition that defamatory statements are presumed[5] to be false) *cert. denied* 479 U.S. 1007, 107 S.Ct. 646, 93 L.Ed.2d 702 (1986). State defamation laws are, however, limited by the First Amendment of the Constitution of the United States of America in certain respects.

The United States Supreme Court has recently summarized the development of these limitations in the case of *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990):

> In 1964, we decided in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, that the First Amendment to the United States Constitution placed limits on the application of the state law of defamation. There the Court recognized the need for "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–280, 84 S.Ct. at 725–26.
>
> \* \* \* \* \* \*
>
> Three years later in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) a majority of the Court determined "that the *New York Times* test should apply to criticism of 'public figures' as well as to 'public officials.' The Court extended the constitutional privilege announced in that case to protect defamatory criticism of nonpublic persons 'who are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.' " [*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 336–37, 94 S.Ct. 2997, 3005–06, 41 L.Ed.2d 789 (1974) ]. . . . The Court has also determined that both for public officials and public figures, a showing of *New York Times* malice is subject to a clear and convincing standard of proof.

*Milkovich,* 497 U.S. at 14–15, 110 S.Ct. at 2703–04.

In the present case, therefore, the threshold question is whether plaintiff was a limited purpose public figure as discussed in *Gertz* and *Milkovich.* If plaintiff was a public figure at the relevant time as to the relevant matter, she must demonstrate, by clear and convincing evidence, that the defendants made false statements with knowledge that the statements were false or with reckless disregard for the truth.

■ The Fourth Circuit has established five criteria to be considered in determining when a person is a limited purpose public figure, including whether:

> (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public figure status at the time of the alleged defamation.

*Fitzgerald v. Penthouse Intern., Ltd.,* 691 F.2d 666, 668 (4th Cir.1982) *cert. denied* 460 U.S. 1024, 103 S.Ct. 1277, 75 L.Ed.2d 497 (1983).

---

**4.** As discussed below, the court would find these other letters not to be defamatory even if they were the subject of the defamation claim. *See infra* § I.E.

**5.** This case, in fact, notes that the burden of proving falsity shifts to the plaintiff in libel actions brought by public figures.

**B. Under the *Fitzgerald* standard, plaintiff was, as a matter of law, a limited purpose public figure at the relevant time.**

■ Both before and after the publication of the letters complained of, plaintiff had access to channels of effective communication. Plaintiff appeared on radio programs both before and after the publication. She published an opinion piece in the very newspaper which later carried the complained-of letters. Plaintiff was also offered, but declined, an opportunity to respond to these letters in the same newspaper. While this access may not have been unlimited, it was certainly sufficient to constitute access to channels of effective communication.

Plaintiff clearly voluntarily assumed a role of special prominence in a public controversy. Certainly, it was on plaintiff's own initiative that the opinion piece was published which led to the responsive letters. Plaintiff also inserted herself into the public debate on this issue by her voluntary appearances on the various radio programs.

Plaintiff, by contrast, argues both that any action she took was not *voluntary* and that the relevant topic was not a matter of *social controversy*. The court must disagree with plaintiff on both issues as a matter of law.

Plaintiff argues that she did not *voluntarily* assume any public role "but was fulfilling her duty as a researcher, teacher and Public Health physician, to inform her 'clients' (in this case the Public at large) of the best scientific evidence available to her." Plaintiff's Response to Local Rule Interrogatory No. 2 at p. 2. While plaintiff's desire to share knowledge may be admirable, or even required by her ethical duties, that does not change the voluntary nature of her decision to assume a role of special prominence in a public controversy. If the court were to allow such an exception, the First Amendment protection would be eliminated whenever the plaintiff was a person who could claim a "calling" to speak out on a topic.

Plaintiff also challenges the assertion that the issue was a matter of social or public controversy. She states in her brief that: "Confusing public interest with social contro-

versy, will inhibit scientists from sharing their knowledge with the Public.... If each physician and/or scientist with knowledge helpful to answer such questions were rendered fair game for lay defamers, the public would be denied valuable information and the very purpose of free press, giving useful and up to date information to the Public, would be defeated." Plaintiff's motion for summary judgment at 1–2.

The court cannot agree with plaintiff's proposed distinction as to do so would eviscerate the First Amendment protections whenever a putative public figure claimed that he or she was merely sharing knowledge on a matter of *public interest* rather than expressing an opinion on a *social controversy*. The distinction seems merely one of semantics, not substance, at least as applied in the present situation.

At the relevant time, governmental, health-related and educational institutions were struggling with issues such as what should be taught about homosexuality and whether it was appropriate to place restrictions on the rights of homosexuals. The issues were being (and continue to be) vigorously debated on a number of levels. This court finds, as a matter of law, that the debate constituted a public controversy.

From plaintiff's own letters, article and actions, it is clear that she was not only aware that the matter was one of public controversy but that she desired to enter that fray. This is demonstrated by the following statement included in plaintiff's article: "So pay attention, but be warned: This article may be hazardous to your political correctness and confidence in your notions of sexual normalcy." The newspaper's letter to plaintiff when it asked her to shorten the article, warned her that the matter was controversial. That letter stated that the article "would, I am sure, stimulate controversy and colloquy among a segment of our readers." Plaintiff's letter accompanying her shortened article similarly indicated a voluntary entry into a volatile debate: "I think the halving made it much less juicy."

The intent to influence the outcome of the controversy is demonstrated by the article itself. In her article, plaintiff took the firm

position that if there is any biological predisposition to homosexuality, it affects only a tiny percentage of the population. She further argued that homosexuality was not "normal." The validity of these two assertions is at the heart of much of the gay rights debate. Although plaintiff did not specifically suggest what measures should be taken to "protect" children and heterosexuals from the gay lifestyle, plaintiff clearly sought to influence the public to demand protections of some form when she stated:

> Society can and must deal with homosexual behavior as it is dealing with smoking behavior: It warns the willing smokers about the risk to themselves but forcibly protects non-smokers, especially children, from taking in the by-products of the smokers' activities.... It is no more possible to screen out secondary smoke from one's lungs than to screen out gay scenes from one's line of vision or gay talk from one's hearing range in the middle of everyday activities and media programs.... Like secondary smoke, no amount, however small, of exposure to the gay lifestyle is known to be good, necessary or even safe for children.

Likewise, the controversy, and plaintiff's entry into it, clearly existed prior to the publication of the allegedly defamatory statements. The challenged letters were, in fact, responding directly to plaintiff's own prior publication of the op-ed piece (and in the same forum) on what was, as noted above, a well known area of hot debate.

Plaintiff retained her limited purpose public figure status at the time of the alleged defamation. For example, she was still accepting speaking engagements on the relevant issue at the time the responsive letters were published. Moreover, the challenged letters followed shortly after plaintiff's op-ed piece was published.

For the reasons stated above, the court finds that plaintiff was a limited purpose public figure. Therefore, to the extent any letters to the editor were responding to plaintiff's publicly stated positions on the issue of homosexuality, those letters must be tested under the heightened malice standard discussed in *New York Times Co. v. Sullivan*

and its progeny. Plaintiff must, therefore, show by clear and convincing evidence that each defendant acted with actual malice, which is defined as knowledge of the falsity of the statement or reckless disregard for its truth.

**C. While there is no "opinion" exception to otherwise defamatory statements, other protections which apply to the expression of ideas are applicable to the allegedly defamatory statements in the Riley letter.**

In determining whether the statements here at issue satisfy the *New York Times* malice standard, this court is guided in particular by the United States Supreme Court's discussion in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (quoted above as to the development of various First Amendment protections applicable in public figure defamation cases). Prior to *Milkovich*, various courts had relied on *dicta* in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), to protect statements of opinion about public figures. In *Milkovich*, however, the Supreme Court rejected any "artificial dichotomy between 'opinion' and fact." 497 U.S. at 19, 110 S.Ct. at 2706. In doing so, the Court reviewed several existing doctrines which it found provided adequate protection for the expression of ideas.

First, the Court noted that "a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least ... where a media defendant is involved." *Id.* at 19–20, 110 S.Ct. at 2706–07. Second, statements are also protected if they "cannot reasonably [be] interpreted as stating actual facts' about an individual." This second protection "provides assurance that public debate will not suffer for lack of 'imaginative expression' or 'rhetorical hyperbole' which has traditionally added much to the discourse of our nation." *Id.* at 20, 110 S.Ct. at 2706–07. Third, plaintiff must prove culpability. "Thus, where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures ..., those individuals must show that

such statements were made with knowledge of their false implications or with reckless disregard of their truth." *Id.* at 20, 110 S.Ct. at 2706–07.

The second protection is the most relevant to the present case, as it was in *Milkovich.* In discussing this protection, the Court in *Milkovich* noted that it was a "constitutional limit[ ] on the *type* of speech which may be the subject of state defamation actions." *Id.* at 16, 110 S.Ct. at 2704.[6] Examples of protected statements included a newspaper article which stated that "some people had characterized [a] developer's negotiating position as 'blackmail[.]'" *Id.* at 16, 110 S.Ct. at 2704. The Court found that these statements were not defamatory because " 'even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable.'" *Id.* at 17, 110 S.Ct. at 2704–05, *quoting Greenbelt Cooperative Publishing Assn., Inc. v. Bresler,* 398 U.S. 6, 13–14, 90 S.Ct. 1537, 1541–42, 26 L.Ed.2d 6 (1970). The Court similarly noted that the word "traitor" as a literary definition of a union "scab" could not be the basis of a defamation action because the term was "used 'in a loose, figurative sense' and was 'merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members.'" *Id. quoting Old Dominion Branch No. 496, Nat'l Assoc. Of Letter Carriers AFL–CIO v. Austin,* 418 U.S. 264, 284–86, 94 S.Ct. 2770, 2781 (1974).

 Therefore, if the use of the term "lie" in the present case is simply "hyperbole" which a reasonable reader would not take as stating actual facts about Dr. Faltas, then the defendants are all entitled to summary judgment on the defamation claim to the extent it is based on Riley's letter. Clearly, whether the term is hyperbole or whether it implies facts turns not on the word itself but on the context in which it is used. *See Milkovich* at 18–19, 110 S.Ct. at

2705–06 (noting that the phrase "[i]n my opinion, Jones is a liar" can cause as much damage as the statement "Jones is a liar"). In *Milkovich,* for instance, the Court found a columnist's statements that the plaintiff had lied under oath to be actionable. *Id.* at 21, 110 S.Ct. at 2707. There are, however, critical distinctions between the present case and *Milkovich.*

The statements at issue in *Milkovich* had been written by a sports writer who stated in his regular column (subtitled "T.D. Says") that the plaintiff, a local high school coach, had lied under oath during a hearing into the cause of an altercation at a sports event. "The column itself bore the heading '[High School] beat the law with the "big lie," ' . . . . The carry over page headline announced . . . '[the author] says [High School] told a lie.'" 497 U.S. at 4, 110 S.Ct. at 2698. The column contained the following language:

> [The students learned a] lesson which, sadly, in view of the events of the past year, is well they learned early.
>
> It is simply this: If you get in a jam, lie your way out.
>
> If you're successful enough, and powerful enough, and can sound sincere enough, you stand an excellent chance of making the lie stand up, regardless of what really happened.

*Id.* at 4–5, 110 S.Ct. at 2698 (quoting article which identified the primary person responsible for these "lies" as the wrestling coach, Milkovich).

Although both the Riley letter and the *Milkovich* article include statements that someone lied or is a liar, the similarity ends there. In *Milkovich,* the author of the article indicated that he had been at the sports event in question and had seen the altercation that was at issue. He had also personally observed the plaintiff's testimony in an initial administrative and later judicial hearing. In fact, the columnist described himself as perhaps the only disinterested person to observe the match and, at least, the initial

---

**6.** Although the Supreme Court discussed these protections in the context of a limited purpose public figure, it is not altogether clear that public figure status should be required for application of this second protection. To the extent it is, however, this court has found that plaintiff is a limited purpose public figure. *See supra* § I.B.

testimony.[7] In other words, the writer presented himself as uniquely situated to report on factual events. The column repeatedly and clearly stated that the plaintiff had lied under oath (the crime of perjury) about the events at the match. *Id.* at 6–7, 110 S.Ct. at 2699–2700 (noting that nine passages in the article reported events which would constitute the crime of perjury).

In finding that the statements at issue in *Milkovich* could support an action for defamation, the Supreme Court stated:

> The dispositive question in the present case then becomes whether a reasonable fact finder could conclude that the statements in the Diadiun column imply an assertion that petitioner Milkovich perjured himself in a judicial proceeding. We think this question must be answered in the affirmative. As the Ohio Supreme Court itself observed: "[T]he clear impact in some nine sentences and a caption is that [Milkovich] 'lied at the hearing after ... having given his solemn oath to tell the truth.'" ... *This is not the sort of loose figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that the petitioner committed the crime of perjury. Nor does the general tenor of the article negate this impression.*

We also think the connotation that petitioner committed perjury is sufficiently factual to be susceptible of being proved true or false.... Unlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event.

*Id.* at 21–22, 110 S.Ct. at 2707–08 (emphasis added—quoting state court opinion below).

In the present case, Riley's letter is expressly responding to Dr. Faltas' op-ed piece which was, itself, written on a highly controversial topic. Riley's letter contains nothing stating or insinuating that Riley has independent knowledge of Dr. Faltas beyond what he garnered from her published article. A reasonable reader would presume the letter is an impassioned response to the positions taken by Dr. Faltas in her article, and nothing more.

The context in which the words "lie" or "liar" were used are also entirely different. In *Milkovich*, the nine or more uses of the term indicated the plaintiff had lied, under oath, about what occurred on a given date at a given time—an "objectively verifiable event." In the present case, the term is used in the context of challenging plaintiff's position on a given controversial subject as to which "experts" obviously disagree, often in less than collegial tones. More specifically, Riley's letter challenged the validity of plaintiff's statistical analysis or whether she had adequate, if any, support for one of her conclusions. While arguably more strongly worded, this is not unlike positions plaintiff took as to the researchers as to whom she was commenting in her op-ed piece.[8]

---

**7.** The entire column is reprinted in the Supreme Court's opinion. 497 U.S. at 5 n. 2, 110 S.Ct. at 2698–2700 n. 2. It contained the following statement:

> I was among the 2,000-plus witnesses of the meet at which the trouble broke out, and I also attended the hearing before the OHSAA, so I was in a unique position of being the only non-involved party to observe both the meet itself and the Milkovich–Scott version presented to the board.
>
> Any resemblance between the two occurrances [sic] is purely coincidental.
>
> * * * * * *
>
> [B]y the time the hearing before Judge Martin rolled around, Milkovich and Scott apparently had their version of the incident polished

and reconstructed, and the judge apparently believed them.

 * * * * * * *

> Anyone who attended the meet, whether he be from [either of the two schools], or impartial observer, knows in his heart that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth.

*Id.* at 5 n. 2, 110 S.Ct. at 2698–2700 n. 2.

**8.** In her own op-ed piece, plaintiff challenged the statistical analysis of other "experts" in terms which would certainly question their professional ability and integrity. In her follow up letter to Catheryn Gray and Kent Krell, plaintiff went even further by stating as to one of these researchers: "[I] *must* assume that any and all plausible sources of error and alternative conclusions that he did not account for were **incompetently or dishonestely** [sic] overlooked." (Italics in original, bold emphasis added).

Therefore, although the words "lie" and "liar" are the critical words in both *Milkovich* and the present case, this court finds the context in which the words were used to be distinguishable in the significant respects discussed above. In context, Riley's letter cannot be seen by a reasonable fact finder as stating actual facts about plaintiff. Rather, his words fall within the protection afforded for "hyperbole."

Riley's statements that plaintiff would "lie to suit her agenda" and would "present lies as truth," in context, translate to either an accusation that plaintiff baldly states conclusions without any data or that she has intentionally misinterpreted the available statistics to support her view of the issue, or both. In other words, at worst, Riley's letter can be interpreted as stating that plaintiff manipulated or ignored statistics. When it comes to "imaginative expression" and "rhetorical hyperbole," few terms have enjoyed so frequent an association in the common culture as the terms "lie" and "statistic." [9]

In determining whether the statements could reasonably be interpreted as stating actual facts, this court has considered the totality of the circumstances surrounding the allegedly defamatory publication. This includes considering the nature and purpose of the letter which was a letter to the editor responding to a recently published opinion piece. Further the underlying issue was not one easily susceptible (if at all) to "proof" one way or the other. Similarly, the op-ed piece and responding letter were on a highly controversial topic as to which emotions and verbal exchanges often ran hot. Finally, there was nothing whatsoever to indicate Riley was basing his statement on anything other than his interpretation of plaintiff's previous op-ed piece and possibly on some contrary statistics or studies which he may have read.

The third *Milkovich* protection also provides a defense to the extent Riley's letter infers that plaintiff lacked any statistical backing for some of her statements. [10] This defense is available at least as to defendant Riley because there is no showing that Riley was aware of any other support plaintiff may have had beyond what was published in the newspaper. It may also apply to the newspaper defendants, although the court will not decide that issue at this time. [11]

**D. To the extent plaintiff's action against *The State* newspaper defendants is founded on Blanchat's letter to a reader, plaintiff's claim must also fail as a matter of law.**

■ The defamation count relies primarily, but not exclusively, on the Riley letter. In addition, plaintiff appears to allege that the newspaper and its employee, Blanchat, defamed Dr. Faltas by writing to a reader. The relevant allegations are set forth below:

7. In September 1993, Blanchat wrote back to a reader (who had written to *The State* to complain about its ignoring how Dr. Faltas was fired as a result, at least in part, of her article in *The State*) that *The State* had "investigated" Dr. Faltas' firing and "determined it had nothing to do with her Op–Ed piece on homosexuality." A copy of that letter, as provided to Dr. Faltas by that reader, is attached hereto

---

**9.** *See, e.g.,* Comment attributed to Benjamin Disraeli in Mark Twain's *Autobiography* Vol. 1, p. 246 (1924) as quoted in *The Oxford Dictionary of Quotations*, 4th Ed. at 249 (Oxford Univ. Press 1992) ("There are three kinds of lies: lies, damned lies and statistics.").

**10.** The third *Milkovich* protection requires proof that any false inferences be made with knowledge of the false implications or with reckless disregard of the truth of the inferences.

**11.** Although the article which plaintiff originally submitted to the newspaper did contain at least some further support for her statements, there is no indication that Riley would have been aware of this information. Moreover, while the longer article originally submitted states plaintiff's reasons for her conclusion, it could still reasonably be challenged for lack of empirical support. This is because plaintiff's conclusion that gays are *"on the average* more likely to have taken estrogen"* is supported only by her statement that this is a "no brainer for any MD." Although plaintiff suggests other physical characteristics that apparently could have been caused by estrogen intake, thus providing a rational basis for her theory, she does not provide any supporting data suggesting that the theory had been tested and proven correct. This is not to say that she may not have such data, only that what she provided to the newspaper lacked such support.

as Exhibit 2 and incorporated herein by reference."

8. As Blanchat's letter postdates USC's appeal committee's unanimous finding of no performance or professional reasons for Dr. Faltas' termination, he must have known that *The State* either did not investigate, or investigated and found that Dr. Faltas' article had a lot to do with her firing. He meant his letter to be, and was, understood (at least by the reader who received it) as asserting that *The State* had determined that Dr. Faltas was fired for inadequate performance.

Complaint Count A, ¶¶ 7–8.

The letter itself, which is extremely brief and is attached to the complaint, is not reasonably susceptible to an inference that the newspaper believed plaintiff *was* terminated for cause. It merely indicates that the newspaper accepts USC's stated position that plaintiff *was not* terminated due to the publication of her piece on homosexuality. Thus, there is no defamatory inference.

Further, plaintiff has presented nothing to suggest that the particular reader who received this letter thought less of plaintiff after receiving it. The context, in fact, suggests that the reader was and remained a supporter of plaintiff since the reader, whose name is not disclosed, provided plaintiff with a copy of the letter.[12] Likewise, there is no allegation of further publication by the paper to anyone else or that any further publication harmed plaintiff. To the extent the defamation claim is based on the Blanchat letter, it is, therefore, also dismissed with prejudice.

### E. No other letters could form the basis of a defamation claim.

■ Although the complaint attaches and references other letters to the editor, plaintiff does not expressly base her defamation claim on any other letter. Even if she were to do so, those letters would not support such a claim for the reasons stated above as to the Riley letter.

Of the three other letters referenced in the complaint, one is similar to Riley's in its statement that plaintiff's position as to gay males using estrogen "is either a joke or a lie; and either way, this sort of fabrication has no place on the op/ed page." Another arguably suggests plaintiff is unqualified as a doctor and should be terminated: "If Dr Faltas is what she claims to be ... lets do without one. If she was educated at any of our institutions of higher education, fire her teachers, too." These comments, though strong, fall within the same protection as the Riley letter. The third letter, which appears more to be the basis of plaintiff's reckless endangerment claim, makes various obvious uses of hyperbole ("Dr. Faltas' discourse *sounded more like ...*" and "*I feel as if ...*"—emphasis added). Although the choice of analogy may have been in bad taste, the letter is not defamatory.

### F. Plaintiff has failed to proffer evidence of proximate cause between her alleged damages and the allegedly defamatory statements or to proffer evidence of any injury other than loss of her position at USC.

■ Alternatively, this court finds that defendants are entitled to summary judgment because plaintiff offered no proof of the damages claimed after Riley raised the damages issue in his summary judgment motion. In her complaint, plaintiff claims damages including loss of her job at USC. In her responses to court interrogatories, by contrast, plaintiff does not refer to her job at USC. Rather, she states:

Plaintiff has written proof of plausible job offers, which she could and would have qualified for and taken ... but for Defendants' acts, which paid "six-figure salary plus stock options." Moreover, she has valid comparisons of royalties and other advantages she could have received from her intellectual property and professional innovations had Defendants not destroyed her professional credibility.

---

12. Neither the complaint nor any affidavit from plaintiff or this reader, with whom plaintiff apparently maintained some contact, suggests damages to plaintiff's reputation flowing from the reader's receipt of this letter.

Plaintiff's response to standard interrogatory (e) (filed October 6, 1995). *See also* Complaint at Counts B–E ¶ 3.

Defendant Riley challenged the existence of any evidence in support of plaintiff's claims of lost opportunities other than the USC position. Despite Riley's challenge, plaintiff has submitted nothing to support these damages claims. Particularly in light of plaintiff's responses to court interrogatories, quoted above, plaintiff would be in a position to present at least some such evidence even before significant discovery.

To the extent plaintiff claims damages for loss of employment at USC, despite her failure to list such damages in her answers to court interrogatories, her claim fails because there is no evidence of any damages proximately resulting from the allegedly defamatory statements.

> One of the most basic principles of tort law is that a person who breaches a duty to a plaintiff is not liable for injuries unless the injuries were proximately caused by the breach. In order to be a proximate cause of an injury, an act must satisfy two requirements.
>
> First, the wrongful act must have been the cause-in-fact of the injury. Determining whether a breach was the cause-in-fact of an injury is primarily an empirical issue, which is often phrased in terms of a "but for" test: But for the breach of duty, would the plaintiff's injury have occurred?
>
> \* \* \* \* \* \*
>
> These same concerns, . . . indicate the need for a second requirement for causation. Although cause-in-fact is necessary and essential to a right of recovery, cause-in-fact cannot serve as the sole test of proximate cause. Some additional limit is needed because any event has a virtually infinite number of causes-in-fact and because the causal effects of an act can extend indefinitely across time and space.
>
> \* \* \* \* \* \*

The South Carolina cases must and do distinguish those causes-in-fact which are legally responsible from those which are not.

\* \* \* \* \* \*

> [For these purposes], South Carolina has adopted the doctrine that negligent conduct is the proximate cause of injury if that injury is within the scope of the foreseeable risks of the negligence. As stated in *Young v. Tide Craft, Inc.,*
>
>> A reading of any of the host of decisions in this State clearly discloses that the touchstone of proximate cause in South Carolina is foreseeability. "Foreseeability of some injury from an act or omission is a prerequisite to its being a proximate cause of the injury for which recovery is sought." . . . The standard by which foreseeability is determined is that of looking to the "natural and probable consequences" of the complained of act. . . . While it is not necessary that the actor must have contemplated or could have anticipated the particular event which occurred, . . . liability cannot rest on mere possibilities.
>
> [270 S.C. 453, 462–63, 242 S.E.2d 671 (1978) (citations omitted).]

Patrick Hubbard & Robert Felix, *The South Carolina Law of Torts* at 97–110, (S.C.Bar 1990) (footnotes omitted).

Plaintiff's first difficulty is with the "but for" prong of the proximate cause test. While it is plausible that a person might be fired for publishing controversial opinions, it is simply too much of a leap in logic to presume that the firing would not have occurred *but for the publication of later letters to the editor* complaining about the initial controversial opinion piece.[13] At the least, this improbability imposes some burden on plaintiff to present some evidence of some causative connection.

The only evidence of a connection offered by plaintiff is that a few days after the Riley letter was published, "Related Defendant Sheridan told Dr. Faltas of the publication. He also told her that it will affect her em-

---

**13.** Indeed, plaintiff's position in this and other cases filed in this court, appears primarily to be that she was fired for giving her opinion, not because of letters written by third parties objecting to the opinions stated by plaintiff. *E.g.* Plain-

tiff's letter to Gray and Krell ("What I got for my scholarly review . . . is demoted"); *Fares & Faltas v. USC,* C/A No.: 3:94–1578–17; *Faltas v. Attorney General of Virginia* C/A No.: 3:95–1521–17.

ployment at USC 'because it shows that her writing is irresponsible and hurts people's feelings.'" Complaint Count A ¶ 4. According to plaintiff, the Riley letter was then placed in her file. As previously noted, the letters attached to plaintiff's memorandum on this issue do not include Riley's letter. Thus, there is a contradiction within plaintiff's own affidavit. Assuming, nonetheless, that a USC employee did confront plaintiff with the Riley letter and that the alleged statement was made in regard to the Riley letter, there is, at best, a most tenuous connection. Therefore, this court does not believe plaintiff's claims can satisfy the but-for test, even at this early stage.

Even if the but-for test was satisfied, the foreseeability link would not be. Given the highly unlikely causation, neither the person writing to the editor nor the paper itself could be expected to anticipate that plaintiff would be fired or otherwise harmed because of subsequent comments on an article plaintiff authored. This is true even if the defendants might anticipate that the employer would take action because of the article authored by the plaintiff.

In short, plaintiff's position is not far removed from holding the newspaper responsible for any adverse consequences flowing from its publication of the article plaintiff voluntarily submitted for publication. Even if plaintiff was terminated for seeking to publish her own op-ed piece, and even if plaintiff could maintain an action against her employer for that termination, it does not follow that she could hold the newspaper responsible.[14]

## II. PLAINTIFF'S ADDITIONAL CLAIMS AGAINST THE STATE NEWSPAPER AND RHONE FOR TORTIOUS INTERFERENCE WITH EMPLOYMENT, RECKLESS ENDANGERMENT, INTENTIONAL INFLICTION OF MENTAL SUFFERING, AND CIVIL AND SECTION 1985(3) CONSPIRACIES.

In addition to the defamation claims, plaintiff asserts several other tort claims against the newspaper and defendant Rhone:

1. Reckless Endangerment;

2. Intentional Infliction of Mental Suffering;

3. Tortious Interference with Employment; and

4. Civil and 42 U.S.C. § 1985(3) conspiracy;

*See* Complaint Counts B–E. For the reasons discussed below, defendants are entitled to summary judgment on all of these claims.

The allegations of these various claims are lumped together collectively as Counts B–E with the following allegations:

1. In June 1993, *The State* published two letters ... one urging that Dr. Faltas not [be] allowed to live "in Columbia, S.C." because she is from "the Middle East where [hate] belongs" and suggesting that she is linked to the World Trade Center bomb, which wantonly exposed Dr. Faltas to violence by suggestible people and frightened her greatly; and another urging that she be fired. She promptly explained her fears to Rhone; but he was indifferent and claimed that she brought it on herself by writing her Op–Ed piece. That was clearly intended to inflict mental suffering on Dr. Faltas.

2. On information and belief, the selective publication of those letters was motivated by class-based animus and resulted from, and was done to further, conspiracies among defendants herein and them and related defendants [in *Faltas v. Attorney General of Virginia*, C/A No. 3:95–1521–17] to deny Dr. Faltas the right to live in peace where she chooses and to not be fired without due process.

3. As a result, Dr. Faltas was summarily discharged, not reinstated despite a unanimous finding of no professional or performance cause to discharge her, and suffered fear, humiliation, mental anguish all of which resulted in physical damage to her health and decrease in her life expectancy

---

**14.** The court is not, by this comment, suggesting that the employer did, in fact, terminate plaintiff for publishing her op-ed piece, only that plaintiff has alleged that this was the basis for her termination in other litigation plaintiff has filed in this district.

and lost earnings and opportunities to advance in her field.

As an initial matter, plaintiff's representation of the content of the first letter is incorrect. The critical language of that letter reads as follows:

I would like to gently suggest that Dr. Faltas' *discourse sounded more like the ranting of a Middle–Eastern cleric than the reasoning of a scientist.* By printing that discourse, I believe *The State* did a disservice to its readers. *I feel as if the World Trade Center car bomb exploded on the editorial page. Lets's leave the irrational hate mongering in the Middle East.* We don't need that in Columbia, South Carolina.

(Emphasis added). Thus, the author only urged that the "hate mongering" be left in the Middle East. He did not suggest that plaintiff should leave this country. Likewise his reference to the World Trade Center bombing in no way suggested a link between Dr. Faltas and the actual bombing.

Even if the letter could reasonably be interpreted as Dr. Faltas suggests, she has not indicated that she was, in fact, subjected to any violence or actual threat of violence as a result. Therefore, even if South Carolina were to recognize a civil action for reckless endangerment, which is not clear, it is apparent that publication of this letter could not support such a claim.[15]

Similarly, the second letter to which plaintiff refers can, at most, be read to suggest that plaintiff be fired. Such a suggestion certainly could not constitute reckless endangerment.

■ Likewise, neither the publication of these letters nor Rhone's referenced letter to plaintiff regarding the various letters can support a claim for intentional infliction of emotional distress. To support such a claim, plaintiff would need to show that the publication or sending of these letters was " 'ex-

treme and outrageous,' exceeding 'all bounds of decency,' 'atrocious,' [or] 'utterly intolerable in a civilized society.' " *Todd v. South Carolina Farm Bureau Mut. Ins. Co.,* 283 S.C. 155, 321 S.E.2d 602, 610 (Ct.App.) *reversed on other grounds,* 287 S.C. 190, 336 S.E.2d 472 (1985). While plaintiff may have been very unhappy that the letters were written and published, they do not begin to reach the level of behavior necessary to support a claim for intentional infliction of emotional distress. This is particularly true when one considers plaintiff's voluntary entry into a raging debate on a controversial issue.

■ Neither can the referenced letters or other alleged actions support plaintiff's claims for tortious interference with employment or conspiracy to deny plaintiff due process. There is no evidence in the record to indicate that any defendant herein took any action beyond submitting or publishing these letters which was intended to interfere or might have interfered with plaintiff's employment or due process rights. Defendants have submitted affidavits denying any such action or intent.

■ By contrast, plaintiff offers nothing other than speculation to support her position that such interference was intended or occurred. This speculation is based on nothing more than the publication of the letters, one of which *can be read* to suggest plaintiff be fired. This court finds, as a matter of law, that publication of a letter to the editor inferring that a person should be fired is simply not enough, standing alone, to support a claim for interference with an employment relationship. Certainly, this rule should apply when the same statement would otherwise be protected by the First Amendment as discussed in Section I above.

The same is true as to plaintiff's claims of conspiracy between these defendants and defendants in the pending case of *Faltas v. The*

---

**15.** In their memorandum in support of summary judgment, the newspaper defendants argue that South Carolina does not recognize a cause of action for reckless endangerment. The legal dictionary definition of the claim is "A statutory offense committed by creating a substantial risk of death or serious injury to another." *Black's*

*Law Dictionary,* at 1270 (6th Ed.1990). Plaintiff's suggested contrary authority is decided under Title VII and Virginia Law and is not, therefore, any indication of whether South Carolina would recognize this tort. *See Paroline v. Unisys,* 879 F.2d 100, 110–111 (4th Cir.1989), *as modified* 900 F.2d 27 (4th Cir.1990) (*en banc* opinion).

*Attorney General of Virginia.* Defendants have submitted affidavits challenging the claims of conspiracy. Plaintiff suggests nothing, beyond pure speculation, to support these claims. These claims must, therefore, be dismissed.

The court is mindful that summary judgment is being granted before significant discovery has been allowed. Given the nature of the allegations, however, the court does not believe discovery would result in any evidence to support plaintiff's claims. Under these circumstances, the court finds summary judgment on the conspiracy claim is appropriate at this stage of the proceedings.

## III. CONSPIRACY TO DEFRAUD

██ Plaintiff's final allegation is for conspiracy to defraud. This claim is asserted against defendant Claudia Brinson. It is based on articles Brinson wrote about two of the defendants in the *Faltas v. The Attorney General of Virginia* case. Plaintiff alleges that these two "related defendants" "conspired with Brinson and others to conceal from the Public the fact that [these related defendants], who sat on [the USC Salary Equity Committee] were seeking—and eventually obtained—undeserved salary raises for themselves." Plaintiff further alleges that Brinson authored articles about the salary equity issue and that she did so "in a one-sided tone overly deferential to [the related defendants], concealing from the Public the outrageous conflicts of interest." In addition to injuries to the public, plaintiff alleges that "[t]hese acts were intended to, and did, injure Dr. Faltas in that they strengthened [the related defendants'] positions at USC and in the community at a time when Dr. Faltas was opposing them." Complaint Count F.

Taking the allegations to be true, this claim is in essence a negligence claim against a newspaper for failure to report news in an unbiased manner or for failure to fully investigate. Further, the action is brought by a person who was not the subject of the article. As discussed in regard to the defamation action, the First Amendment affords numerous protections even when an action is brought by the subject of a published article

for false statements of fact. If a newspaper is protected from unintentional misstatements about the public figure who is the subject of an article, certainly it cannot be held liable for a failure to fully investigate and report which allegedly causes some remote injury to a third party.

██ The conspiracy to defraud claim must also fail for lack of standing. Plaintiff lacks standing to assert any general public interest. To the extent plaintiff alleges direct injury, the claim must fail for lack of proximate cause. In essence, plaintiff argues that the reporter wrote a positive article about two USC professors when that reporter should have written an article critical of them. Plaintiff then suggests that if the author had written a critical article, the employer of these two "related defendants" would not later have believed these persons when they spoke ill of plaintiff. Such causation is just too remote as a matter of law.

Finally, defendant Brinson has filed an affidavit challenging plaintiff's suggestion that she intentionally wrote a biased piece. Plaintiff has suggested no contrary evidence.

For all of the reasons stated above, the court finds that plaintiff's claim for conspiracy to defraud and other related conspiracy claims should be dismissed with prejudice.

## IV. OTHER MOTIONS

There are currently pending various other motions, generally related to the discovery process. These motions were briefed prior to and argued at the March hearing. The court indicated at the time of the hearing that it would provide further guidance on discovery if the case were to go forward. Because the court has determined that the matter should not go forward, all motions to compel discovery are hereby rendered moot.

The court has, nonetheless, considered plaintiff's motions to compel to insure that there was no discovery requested which would be necessary for her to fairly oppose the present summary judgment motions. The court has determined that there was no such discovery outstanding.

The court has further determined that sanctions are not appropriate as to any pending discovery motion or motion for Rule 11 sanctions. Any other pending motions are also rendered moot by this order (*e.g.* Defendants' motion to strike and Plaintiff's motion for judgment on the pleadings).

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment is denied; the defendants' motions for summary judgment are granted; and this action is hereby dismissed with prejudice.

IT IS SO ORDERED.