**NOT FOR PUBLICATION**
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

FILED



DEC 13 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| KATINKA HOSSZU,<br><br>            Plaintiff-Appellant,<br><br>v.<br><br>CASEY BARRETT, an individual;<br>SPORTS PUBLICATIONS<br>INTERNATIONAL, INC., DBA<br>Swimming World Magazine, DBA<br>SwimmingWorldMagazine.com; DOES, 1<br>through 20, inclusive,<br><br>            Defendants-Appellees. | No.    16-16571<br><br>D.C. No. 2:15-cv-02285-GMS<br><br>MEMORANDUM[*] |

Appeal from the United States District Court
for the District of Arizona
G. Murray Snow, District Judge, Presiding

Argued and Submitted October 13, 2017
San Francisco, California

Before:  THOMAS, Chief Judge, and REINHARDT and TROTT, Circuit Judges.

Katinka Hosszu, an Olympic and World Champion swimmer, sued Casey

Barrett and *Sports Publications International* ("SPI," collectively "Barrett") under

---

[*]      This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

28 U.S.C. 1332(a), diversity of citizenship, and Arizona law for (1) defamation "per se" and (2) portrayal in a false light. Hosszu predicated her claims on multiple articles Barrett wrote which were published in SPI's *Swimming World Magazine* ("SWM") which she says falsely implied that her remarkable professional accomplishments were the product of her secret use of banned performance-enhancing drugs ("PEDs").

The district court dismissed Hosszu's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief could be granted. The court concluded that Barrett's writings were not reasonably capable of sustaining a defamatory meaning, and that the challenged statements fell within the protective ambit of the Constitution's First Amendment as "statements of opinion on matters of public concern that do not contain or imply a provable factual assertion." Underwager v. Channel 9 Australia, 69 F.3d 361, 366 (9th Cir. 1995) (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990)). Equally unsuccessful were her false light claims.

We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291, and we affirm.

**I**

We review de novo a district court's grant of a Rule 12(b)(6) Motion for Failure to State a Claim, including a ruling that a challenged statement was not defamatory as a matter of law. "[W]e accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party," Katinka Hosszu. Knievel v. ESPN, 393 F.3d 1068, 1072 (9th Cir. 2005). In order to prevail on appeal, she must demonstrate that Barrett's statements are "'reasonably capable of sustaining a defamatory meaning,' . . . [and] that they are not mere 'comment within the ambit of the First Amendment.'" Knievel, 393 F.3d at 1073-75 (citation omitted). In approaching this task, we "ask as a threshold matter whether a reasonable factfinder could conclude that the contested statement[s] impl[y] an assertion of objective fact. If the answer is no, the claim is foreclosed by the First Amendment." Partington v. Bugliosi, 56 F.3d 1147, 1153 (9th Cir. 1995) (citation omitted).

## II

Read fairly as a whole, we conclude that Barrett's collective articles "are not statements implying the assertion of objective facts but are instead interpretations of the facts available to both the writer and the reader." Id. at 1156. The consumer of Barrett's articles is left "free to draw his own conclusions." Id. at 1157.

First, the "general tenor of the entire work negates the impression that the defendant was asserting an objective fact." Id. at 1153. The title of Barrett's May 20, 2015 article is a question: "Are Katinka Hosszu's Performances Being Aided?" The third line of the piece reads, "There is no proof." Barrett also writes, "I hope my suspicions are wrong now." The article is labeled "Commentary." In addition, SWM edited the May 20 article to include a link to the Hungarian Swimming Federation's official statement defending Hosszu–a statement issued after SWM first posted the article–as well as an additional disclaimer from SWM emphasizing that the piece is commentary reflecting the opinion of its author.

Second, Barrett uses "figurative or hyperbolic language" throughout his articles that negate an assertion of objective fact. Id. Unlike other cases in which defamation claims proceeded beyond a Rule 12(b)(6) motion, the statements at issue do not directly accuse Hosszu of using illegal substances to achieve her stellar record. See Pacquiao v. Mayweather, 803 F.Supp.2d 1208, 1212 (D. Nev. 2011) (denying Rule 12(b)(6) motion where defendant allegedly told news reporter that he "was sure" plaintiff used PEDs). Read in their totality and in a light favorable to Hosszu, Barrett's colorful, and at times, crude, analogies and cliches stop short of making an accusation, raising instead a question of public concern:

4

Could her remarkable sustained performances be the product of PEDs, not of her intense training regime?

Third, whether an athlete is doping is not always or easily "susceptible of being proved true or false." Partington, 56 F.3d at 1153. Although, in theory, someone could monitor Hosszu every minute of every day to observe any use of PEDs, the issue that Barrett–and other journalists speculating about athletes' use of PEDs–explains is that testing technology is not evolving quickly enough to detect new types, doses, and applications of PEDs. Unlike testing for other substances, there is no available, reliable means to definitively confirm PED use. See Standing Committee on Discipline of U.S. Dist. Ct. for Cent. Dist. of Cal. v. Yagman, 55 F.3d 1430, 1441 (9th Cir. 1995) (finding statement that Judge Keller was "drunk on the bench" "implies actual facts that are capable of objective verification").

Barrett's articles "may imply" that Hosszu uses PEDs, but they are nevertheless "protected by the First Amendment and therefore not actionable." Partington, 56 F.3d at 1153.

## III

Hosszu's false light claim based on the May 20 article and the subsequent "Women Rule the Worlds" article fail for the same reason as do her defamation claims.  See id. at 1160 (explaining "statements are protected by the First

5

Amendment, regardless of the form of tort alleged"). Her additional false light claims, based on "Doping: How Not to Get Caught" and "Suspicious Minds and the Doping Rumor Mill," fail because those articles are not "of and concerning" her. See Hansen v. Stoll, 636 P.2d 1236, 1240 (Ariz. Ct. App. 1981). Finally, Hosszu cannot succeed in her false light claims by recasting them as an actionable portrayal of her "private life in a false light." See Godbehere v. Phoenix Newspapers, Inc., 783 P.2d 781, 789 (Ariz. 1989). Hosszu spoke publicly about her depression. For the same reasons articulated above, Barrett's article cannot be reasonably interpreted to portray her depression as the impetus for her doping.

**IV**

State laws that make defamation actionable have the laudable purpose of allowing an individual victimized by false and defamatory material to vindicate her good name, and also to obtain redress for harm caused. Milkovich, 497 U.S. at 11-12. In this vein, we have counseled authors "to avoid creating the impression that they are asserting objective facts rather than merely stating subjective opinions." Partington, 56 F.3d at 1155. On the other hand, we have also said that "[a]uthors should have 'breathing space' in order to criticize and interpret the actions and decisions involved in a public controversy. If they are not granted leeway in interpreting ambiguous events and actions, the public dialogue that is so important

6

to the survival of our democracy will be stifled." Id. at 1159.  Barrett's

commentary falls into the latter category of subjective opinion.

Hosszu's discomfort with Barrett's critical articles is understandable, but the

First Amendment was not designed to make anyone comfortable.  On balance, such

discomfiture is a small price to pay for the essential benefits of freedom of speech.

**AFFIRMED**.

Hosszu v. Barrett, No. 16-16571

TROTT, Circuit Judge, dissenting:

**I**

Mr. Barrett's articles accuse Katinka Hosszu of using banned PEDs to achieve her exceptional record, an accusation about which he has no doubt. As he resolutely declares, "Anyone reading this knows my opinion of Hungary's 'Iron Lady.' That opinion remains unchanged, unwavering and has been defended by world class counsel." Nowhere does he remotely suggest he is simply inviting others to form their own conclusions, or that his is speculating based upon suspicious circumstances. Barrett could easily have written his piece within the bounds of fair comment, but he deliberately did not. His comments about hoping he is not right are insincere throwaways. He wrote his articles as an exposé, as an indictment – and as he says, he meant it.

Barrett begins by asserting that "no one, ever" consistently competes at a higher level than Katinka Hosszu, no one, not even Michael Phelps or Katie Ledecky, unquestionably the two greatest competitive swimmers of all time. Phelps has 23 Olympic Gold Medals, Ledecky five. Moreover, Ledecky is a nine-time World Champion. The conclusion is inescapable: No human being could have accomplished Katinka Hosszu's superhuman record without resorting to PEDs.

Based on his special knowledge as an expert, Barrett reveals her inculpatory motive for cheating: her failure to win a Gold Medal in the 2012 London Olympics. But it's more than just wanting to win. The winner's time and performance in Katinka Hosszu's signature event seemed so impossible that many suggested out loud that her competitor was fueled by PEDs. Barrett says Katinka Hosszu's spirit was so shattered by the loss that she "wanted to go home" and lapsed into a serious depression. What lesson does Barrett assert that she learned from this experience? That to beat dopers, you yourself must dope. I quote from his "in-the-know" lead article:

> Yet, here's one thing that we've learned in producing a documentary [about the East German women's swim team] that centers around doping and the dark clouds that circle it. There is one prerequisite for athletes who dope: They must convince themselves that their competition is doing it. That is the only thing that can validate crossing this line.
>
> In 2012, Katinka Hosszu's spirit was crushed by a performance achieved through dubious means. Ever since, she has been the one standing atop every podium.

Invoking again the, "doped East German team," he says, "Nothing has changed. Forty years later it continues to happen, in every sport, every time there's a champion who stretches plausible achievement in ways that don't quite pass the bullshit test for anyone paying attention." That champion, of course, is Katinka

Hosszu.

As for her physique, Barrett calls her "Exhibit A" for the proposition that the "visual evidence on the body and the scoreboard – generally doesn't lie." What proves his charge? Just look at her.

Barrett delivers his coup de grace by destroying Hosszu's defense: that she has always tested drug free. Based on his special knowledge, he explains why only the "inadvertently stupid and the dirty stupid" get caught, at least in the short-run. "The next time you hear someone proclaim innocense by pointing to all the drug tests she's passed, try not to laugh." He deftly turns Katinka Hosszu's unblemished record of clean drug tests into evidence not that she has competed drug free, but that she is too clever a doper to get caught. He casts her as the next Lance Armstrong, one of the most reviled liars and cheats of the athletic world.

As an expert on the subject who perceives "obvious" things others do not, Barrett presents his allegedly conclusive evidentiary case against Hosszu in a manner that demands only one conclusion, one verdict in the mind of the reader. As he says, "And where there's smoke . . . Hell, finish the cliche yourself." The universal answer is, "There's fire," i.e., Katinka Hosszu cheats. Guilty. Only someone dumb enough to be fooled by a stripper's silicone breast implants – Barrett's analogy – could conclude otherwise. Armed with "world class counsel,"

one wonders why he does not relish the opportunity to defend his accusations.

## II

All constitutional rights have limits, and so does Freedom of Speech.  One cannot falsely yell "fire" in a crowded theater, or lie to the FBI, or disingenuously offer to unsuspecting investors a 15% return from what amounts to a Ponzi scheme.  Neither can one person knowingly and deliberately libel, slander, or defame another with false facts.  The laws of all states disfavor such conduct. Robust speech and debate about matters of public interest is certainly the air a democracy needs to breathe, but not at the expense of unfairly destroying a person's reputation.

In Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990), the Court republished Justice Stewart's explanation in 1966 of the reason that justifies excluding defamation from the First Amendment's protective umbrella:

> The right of a [woman] to the protection of [her] own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being —a concept at the root of any decent system of ordered liberty.
> . . . . .
> The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem. Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a [woman] whose reputation has been falsely dishonored.

Id. at 22-23 (quoting Justice Stewart's concurring opinion in Rosenblatt v. Baer, 383 U.S. 75, 86 (1966)) ("Society has a pervasive and strong interest in preventing and redressing [defamatory] attacks upon reputation").

Consequently, as we explained in Partington v. Bugliosi, 56 F.3d 1147 (9th Cir. 1995), the First Amendment does not shelter a defamatory false factual statement from an action for libel. Id. at 1152-53. Neither labeling something an "opinion," nor "commentary," nor phrasing it in the form of a question automatically gets an author like Barrett off the hook. Id. at 1152-57; Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1094 (4th Cir. 1993). The dispositive question in the analysis flowing from these principles is "whether a reasonable factfinder could conclude [without torturing the wording] that the contested statement 'impl[ies] an assertion of [a defamatory] objective fact.'" Partington, 56 F.3d at 1153 (emphasis added).

And how do we resolve such controversies when they arise? By providing a forum in our judicial system for their resolution, in an orderly and thoughtful way according to established rules and procedures. Unfortunately, our resolution of this case inappropriately deprives Katinka Hosszu of the opportunity she requests to settle this controversy in a court of law, leaving her to the vicissitudes of the wilderness. Stripped by Barrett of the only objective method she has for defending

-5-

herself – official third-party drug testing – we leave her where he has put her: publically denounced with the impossibility of proving a negative.

The issue before us is not whether Barrett's opinion is right or wrong, but only whether Hosszu's case on its face should have survived Barrett's motion to dismiss. I conclude that it passes that threshold test. She has tendered a case sufficient to believe that her reputation has indeed been falsely dishonored.

As we said in Partington, "Milkovich makes clear that authors . . . must attempt to avoid creating the impression that they are asserting objective facts rather than merely stating subjective opinions." Id. at 1155 (emphasis added). Not only was Barrett not careful to avoid such an impression, but his polemic is a modern version of "J'accuse."

As an aside, quite possible we do Hosszu an unintended favor. Often the only thing worse than what has happened to you is what happens when you try to fix it. Delivering yourself into the jaws of our lengthy and costly court system is not a pleasant experience. Depositions, interrogatories, discovery, and cross-examination – it's not for the faint of heart, especially in a case for defamation. The sports media would feast on this nasty trial, reminding us of the clever but prudent warning to be careful what you wish for because you may get it.

If Barrett truly meant only what his litigation counsel claims he meant, one

wonders if Barrett will have the integrity to clarify his "unwavering opinion" instead of triumphantly proclaiming victory, using our decision to justify it. Or, will counsel's brief turnout to be just another example of an adversarial litigation position taken to win a case. The proof of the pudding will be in the eating.

I respectfully dissent.